891 A.2d 1085

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Joseph M. GUIDA.**

**Misc. Docket AG No. 17, Sept. Term, 2004.**

Court of Appeals of Maryland.

Feb. 7, 2006.

Glenn M. Grossman, Deputy Bar Counsel (Melvin Hirshman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

Lawrence P. Pinno, Esquire, of Bel Air, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

## I.

In this attorney disciplinary action, the Attorney Grievance Commission of Maryland ("Petitioner"), acting through Bar Counsel, filed a Petition for Disciplinary or Remedial Action against Joseph M. Guida, Esquire ("Respondent"), charging him with violations arising out of his representation of Mr. and Mrs. Danny Lee Bird. Respondent was charged with violating Rules 1.1 (Competence),[1] 1.3 (Diligence),[2] 1.4(a) and (b) (Communication),[3] 1.5(a) (Fees),[4] 1.15(a)

---

1. Rule 1.1 provides:
 A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.
 Unless otherwise provided, all Rule references in this opinion are to the Maryland Rules of Professional Conduct ("MRPC").

2. Rule 1.3 provides:
 A lawyer shall act with reasonable diligence and promptness in representing a client.

3. Rule 1.4(a) and (b) provide:
 (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
 (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

4. Rule 1.5(a) states that:

(Safekeeping Property),[5] 8.1(b) (Bar Admission and Disciplinary Matters),[6] and 8.4(c) and (d) (Misconduct)[7] of the Mary-

> A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

5. Rule 1.15(a) provides:

> A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

6. Rule 8.1(b) provides:

> An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:
>
> * * * * * *
>
> (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

7. Rule 8.4(c) and (d) provide:

> It is professional misconduct for a lawyer to:
>
> * * * * * *
>
> (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

land Rules of Professional Conduct ("MRPC"); [8] and Maryland Rule of Procedure 16–812.[9]

The case was assigned by this Court to Judge Emory A. Plitt, Jr. of the Circuit Court for Harford County to conduct an evidentiary hearing and thereafter render findings of fact and recommended conclusions of law with regard to the alleged violations. After a number of extensions of time were granted by this Court, the hearing judge commenced the evidentiary hearing on 13 January 2005 [10] and carried it over to 18 March 2005 when it was concluded.

On or about 7 April 2005, Judge Plitt filed his 25 March 2005 written opinion in this matter. In the opinion, the hearing judge made the following factual findings, by a clear and convincing evidentiary standard: [11]

The Respondent, Joseph M. Guida, was admitted to the Bar of the Court of Appeals on December 1, 1976. He most recently maintained an office for the practice of law at 608 South Main Street, Bel Air, Maryland 21014.

---

(d) engage in conduct that is prejudicial to the administration of justice.

8. Because Respondent's conduct occurred prior to 1 July 2005, the effective date of the latest global revision of the MRPC, the version of the MRPC in effect prior to 1 July 2005 is applicable to the present case.

9. Maryland Rule 16–812 simply adopts the MRPC, as set forth in the appendix of the Maryland Rules of Procedure, and does not constitute a discrete provision establishing a standard of conduct itself which one may be said to have violated.

10. Although Respondent could not be present at the 13 January 2005 hearing, his counsel represented that Respondent specifically authorized the hearing to proceed in his absence.

11. Bar Counsel earlier had provided to Respondent and his counsel a written Request For Admissions of Fact and Genuineness of Documents. The Request went unanswered. At the hearing, Respondent's counsel conceded the truth of the matters contained in the Request. Accordingly, and pursuant to Maryland Rules 16–756 and 2–424(b), the matters addressed in the Request were deemed admitted for purposes of these proceedings.

Stacia Lynn Bird is the mother of Kaitlyn Stanley (d/o/b 9/25/90) and Jessica E. Stanley (d/o/b 9/12/93). On July 15, 1998, this court issued a Judgment of Absolute Divorce at Mrs. Bird's request from her then husband, David Lee Stanley. David Lee Stanley is the natural father of Kaitlyn and Jessica. Mrs. Bird was awarded sole custody of Kaitlyn and Jessica. Subsequent to her divorce from Mr. Stanley, she married Danny Lee Bird. After some discussion, Mr. and Mrs. Bird decided that they would like to petition an appropriate court for Mr. Bird to formally adopt Kaitlyn and Jessica.

Mr. and Mrs. Bird contacted Mr. Guida in May of 2002 to possibly retain him to handle the adoption matter. Mr. Guida completed an "Attorney New Matter Memo" on May 8, 2002. Mr. Guida discussed with them how adoptions are handled and told Mr. and Mrs. Bird that they would need to obtain documents and additional information for him before he could proceed. Mr. and Mrs. Bird obtained the services of Mr. Guida through a legal services plan referral.

Mr. and Mrs. Bird formally retained Mr. Guida to handle the adoption matter in August of 2002. They paid Mr. Guida the sum of $735.00 on August 16, 2002. Previously on July 22, 2002, Mr. Guida sent Mr. and Mrs. Bird a Retainer Agreement which they signed and returned to him. Thus, as soon as the agreed fee was paid, Mr. and Mrs. Bird completed the arrangements with Mr. Guida and he undertook the representation. The gap between July 22, 2002 and August 16, 2002 had to do with the Birds "getting the money together" and obtaining some additional documents for Mr. Guida. Mr. Guida admitted that by early September, 2002, he had received full payment and all necessary documents. Mr. Guida told Mr. and Mrs. Bird that the entire adoption process would take anywhere between three and four months.

After retaining Mr. Guida, Mrs. Bird would periodically contact his office to inquire as to progress. Between October 1, 2002, and the end of May, 2003, Mrs. Bird and her husband contacted Mr. Guida's office on numerous occa-

sions. These contacts were by telephone and in person. In addition to contacting Mr. Guida's office, Mr. and Mrs. Bird contacted the Cecil County Circuit Court Clerk's Office to check on the status of their case. When they did, they found out there was no case yet filed.

On some of these occasions (status contacts), Mr. Guida told the Birds that the case was delayed in the court. He told the Birds that he would check the progress of their case with the court and let them know. Mr. Guida told the Birds these things knowing full well that he had never filed the action with the court.

Sometime in December of 2002, in response to one of the Birds' many inquiries, Mr. Guida gave Mrs. Bird a document entitled "Judgment of Adoption *Pendente Lite.*" When he gave this document to Mrs. Bird, he told her that the Judge decided to issue a temporary adoption Order while attempts were made to locate the girls' natural father. A handwritten notation appears on the bottom of the Order stating that a final Order would be issued in 60–90 days. The Order and the handwritten notation at the bottom purport to bear the signature and initials respectively of the Honorable O. Robert Lidum, Judge of the Circuit Court for Cecil County. In a word, the purported Order is a fraud and the alleged signature and initials of Judge Lidum are forgeries. Judge Lidum provided an Affidavit to the Attorney Grievance Commission so stating and Mr. Guida has admitted that the document is a fake and that he forged the document and Judge Lidum' signature and initials.

Mr. and Mrs. Bird were very concerned about the matter in March of 2003, three months having passed. Mr. Guida told them that he would check the status with the court. Thereafter, Mr. Guida failed to return phone calls from the Birds and was not in his office when the Birds would go there to inquire.

Finally, in May of 2003, Mr. Guida told the Birds he was going to have surgery but would check with the court concerning the progress of their case and get back to them. He never did. Having received no communication or re-

sponse from Mr. Guida, the Birds filed their complaint with the Attorney Grievance Commission on July 7, 2003.

Two days after the Birds filed their complaint with the Attorney Grievance Commission, Mr. Guida wrote them a letter apologizing for his actions. In that letter of July 9, 2003, he attributed his failures to physical and psychological problems. He enclosed with that letter a check in the amount of $735.00 representing a full refund of the money that the Birds had paid Mr. Guida when they retained him.

After being formally notified by the Attorney Grievance Commission of the Birds' complaint, Mr. Guida ultimately responded to Deputy Bar Counsel, Glenn M. Grossman, by letter dated September 16, 2003. In his letter to Mr. Grossman, Mr. Guida admitted the truth of the Birds' complaint. However, in that same letter, Mr. Guida did not explain the fraudulent adoption Order. The formal notification to Mr. Guida from the Attorney Grievance Commission of the Birds' complaint was a letter to Mr. Guida from Mr. Grossman dated July 13, 2003. Mr. Grossman's letter directed Mr. Guida to respond within 10 days. He did not. In fact, Mr. Guida did not respond as directed by Mr. Grossman until September 16, 2003, some two months after the date of Mr. Grossman's letter.

Mr. Guida has also admitted that after receiving the $735.00 payment from the Birds he failed to deposit and maintain those funds in the required trust account.

[]Mr. Guida admits the truth of what happened. [] When the hearing of January 13, 2005 was adjourned, [his attorney] again told me that Mr. Guida does not dispute the facts and that the real issue in this matter is mitigation. (Internal footnote omitted; some alterations in original).

Based on the facts as found by him (and conceded by Respondent), the hearing judge, citing as authorities *Att'y Griev. Comm'n v. Christopher,* 383 Md. 624, 861 A.2d 692 (2003) and *Att'y Griev. Comm'n v. Vanderlinde,* 364 Md. 376, 773 A.2d 463 (2000), concluded that, as to the flagship charges,

Respondent violated Rules 8.4(c) and (d). He reasoned as follows:

> [Respondent's] creation of a fraudulent adoption Order and his forgery of the signature and initials of Judge Lidum and thereafter representing to the Birds that it was a bonafide Order of the Circuit Court for Cecil County is beyond any shadow of a doubt dishonest, fraudulent, deceitful and a gross misrepresentation in violation of Rule 8.4(c). It is also without doubt, clearly prejudicial to the administration of justice in violation of Rule 8.4(d). Mr. Guida intended that the Birds rely on the fraudulent Order. He then gave the Birds a handwritten note suggesting that they "give this copy to the girls for Christmas."

> Respondent also violated Rule 8.4(c) and Rule 8.4(d) by his continuing misrepresentations amounting to outright lies to the Birds concerning the status of their case and his representation to the Birds that the Order was genuine.

> As to these violations, the violation of Rule 8.4(c) are obvious. As to Rule 8.4(d), such conduct is clearly prejudicial to the administration of justice. Clients and the public have the right to expect that attorneys will be truthful and, when it comes to court proceedings, that they can rely on what they are told and the purported court documents given to them. One can only imagine the Birds' reaction when they actually went to the Circuit Court for Cecil County and ultimately found out that nothing had been filed. Mr. Guida's conduct clearly is a blow to the administration of justice and thus, in the final analysis prejudicial thereto. (Internal citation omitted).

Judge Plitt concluded that Rule 1.3 also had been violated by Respondent, in that "agreeing to represent the Birds, he took no action at all to follow through on the adoption ... a relatively uncomplicated matter." A violation of Rule 1.15(a) was found because the fee and cost advance paid by the Birds to Respondent was not deposited into a trust account.

As to Rules 1.4(a) and (b), the hearing judge found the former to have been violated (the Birds were not kept reason-

ably informed about the status of the adoption initiative), but not the latter (the Birds testified that Respondent explained what was necessary to accomplish the adoption and they both professed to understand what was expected).

The hearing judge was not persuaded sufficiently that the claimed violation of Rule 1.5(a) had merit. Rather, he concluded that the $735.00 flat fee for the adoption undertaken, including court costs, was not unreasonable.

Finding a violation of Rule 8.1(b), the hearing judge noted that Respondent conceded that he failed to respond timely to Bar Counsel's request for information.

Finally, the hearing judge found a violation of Rule 1.1 because, although no evidence was presented that Respondent lacked the requisite latent knowledge or skill to handle an adoption of the relatively uncomplex nature of the one sought by the Birds, he clearly did not provide the thoroughness and preparation for the undertaken representation.

Turning to the matter of mitigation, which the hearing judge duly noted needed to satisfy only a preponderance of the evidence standard (Md. Rule 16–757(b)), Judge Plitt concluded:

Mr. Guida has established by a preponderance of the evidence that prior to the death of his father in 1999, he had a relatively successful law practice. After the death of his father, he started having difficulty. It was revealed during the testimony on March 18, 2005, that Mr. Guida was the subject of a Conditional Diversion Agreement [with Petitioner] in 2001 having to do with his failure to record a deed for another client. That Conditional Diversion Agreement apparently terminated close to the time that he undertook representation of the Birds. The Birds' complaint was received by the Attorney Grievance Commission on July 7, 2003. By letter of July 15, 2003, from Deputy Bar Counsel, Glenn M. Grossman, Mr. Guida was advised of the complaint and directed to provide information. It is clear that at least by June 19, 2003, Mr. Guida knew a complaint was coming. On that date, Mrs. Bird contacted the Circuit Court for

Cecil County concerning the fraudulent Order. At the request of an employee of the Clerk's Office, she faxed a copy of the Order to the court. Almost immediately she was contacted by the Clerk's Office and advised that the Order was fraudulent and also was advised that she should contact the Attorney Grievance Commission. On that same date, she confronted Mr. Guida concerning the matter via telephone call. At that point, Mr. Guida knew he was in trouble. By letter of July 9, 2003, he returned the Birds' money to them and admitted what he had done. He had also had at least a preliminary exchange of correspondence with Mr. Grossman. The significance of this is that shortly thereafter, in August of 2003, Mr. Guida contacted Gary Pasquinelli, Ph.D., a psychologist. Dr. Pasquinelli testified that when he first saw Mr. Guida it was his recollection that he was taking an anti-depressant that had been prescribed for him by his medical doctor.[12] Dr. Pasquinelli testified that after his initial evaluation, Mr. Guida came under his care for individual psycho-therapy and has been in his care every since on a weekly or bi-weekly basis. Dr. Pasquinelli described Mr. Guida at the time he undertook his therapy as being very negative and experiencing difficulty with fatigue and other symptoms of depression. Dr. Pasquinelli suggested that Mr. Guida obtain additional medication which he ultimately did. Dr. Pasquinelli's testimony was relatively brief and centered on his initial evaluation of Mr. Guida and his continuing treatment of him.

At the request of Mr. Guida's counsel, Mr. Guida was evaluated by Dr. Christiane Tellefsen, M.D., a Board Certified Forensic Psychiatrist.[13] Dr. Tellefsen met with Mr. Guida on March 19, 2004. In addition to her interview with Mr. Guida, Dr. Tellefsen reviewed treatment records of Dr.

---

12. Judge Plitt noted that Respondent did not identify the name of the prescribing physician.

13. Judge Plitt observed, in a footnote, that Dr. Tellefsen had been recommended by Deputy Bar Counsel to Respondent's counsel as a psychiatrist who was well acquainted with attorney grievance matters.

Pasquinelli. She also interviewed Mr. Guida's wife and Judith Eagle, Esquire, a local attorney with whom Mr. Guida shares office space. She also reviewed material supplied to her by Mr. Grossman and the previous Conditional Diversion Agreement. Dr. Tellefsen described her mission as to determine whether or not, in her professional opinion, Mr. Guida had any mental disorder or emotional problems affecting his conduct. Dr. Tellefsen was also provided with information concerning the complaint of the Birds.

Dr. Tellefsen described Mr. Guida as a good student who had a good Jesuit education and was intellectually successful. He was also involved in numerous outside activities, talented musically and having a successful practice. Mr. Guida had previously served as an Assistant United States Attorney and had been employed at the law firm of Smith, Somerville and Case prior to setting out on his own. His mother and father came to the United States from Italy and settled in New Jersey where he was born. Dr. Tellefsen opined that the death of Mr. Guida's father in 1999 affected him more than he may have realized. Dr. Tellefsen described Mr. Guida as coming from a traditional Italian Catholic Jesuit background and, as the oldest sibling, having to take responsibility of the family upon the death of his father. This included a responsibility, off and on, for taking care of his mother. Following the death of his father, Mr. Guida's health deteriorated. He gradually withdrew from the multitude of outside activities in which he was involved and, according to Dr. Tellefsen, started a downward slide into major depression.

His depression was compounded by a back injury in 2002 which ultimately required surgery. He experienced a lot of back pain and neurological difficulty. He had to take medication for the back pain.

From her discussion with Mr. Guida, Ms. Eagle, and Mr. Guida's wife, Dr. Tellefsen determined that Mr. Guida, at some point along the depression scale, started to in essence lose control of his practice. He started staying away from

the office and not following up on inquiries from clients. He gained about 100 pounds in weight, had no energy, had back pain, and became withdrawn. It was Dr. Tellefsen's opinion that Mr. Guida's depression became worse in June of 2002, some months before his surgery. Dr. Tellefsen learned that Mr. Guida became the subject of many complaints from his clients concerning his lack of attention. According to Dr. Tellefsen, Mr. Guida basically ignored his practice. Mr. Guida himself testified that he lost important clients. He was terminated as a participant in a pre-paid legal services plan as a result of the Birds' complaint. Dr. Tellefsen agreed with Dr. Pasquinelli that Mr. Guida had suffered from severe depression during the time he was representing the Birds.

In response to questions from Bar Counsel on cross-examination, Dr. Tellefsen testified that she could not find any indication of any dishonesty on Mr. Guida's part.

It was Dr. Tellefsen's opinion that during the course of his representation of the Birds, Mr. Guida suffered from major depression complicated by his back troubles and other medical problems (including his obesity) and that the combination of these things severely impaired his ability to maintain his functioning and his law practice.

As previously noted, by letter of July 9, 2003, Mr. Guida returned the Birds money to them and apologized for his actions. He expressed remorse in that letter and expressed remorse when he testified before me on March 18, 2005.

The question for me then is do I find by a preponderance of the evidence that Mr. Guida has established mitigation? Based on the uncontradicted testimony of Doctors Tellefsen and Pasquinelli, I find that Mr. Guida has established mitigation. That is not the end of it.

With regard to the violations of Rules 1.3, 1.4, and 8.4, I find that he has not established mitigation by a preponderance of the evidence.

Dr. Tellefsen was asked very specifically about the fraudulent adoption Order and the forging of Judge Lidum's

signature. Dr. Tellefsen said that she thought that Mr. Guida saw the forgery as a way to satisfy the Birds. While she characterized Mr. Guida's depression as a "strong influence" on his actions, Dr. Tellefsen testified that in her professional opinion, Mr. Guida had created the fraudulent document and forged Judge Lidum's signature knowing exactly what he was doing and knowing that it was wrong and deceitful. Dr. Tellefsen also testified that Mr. Guida knew that he had not followed through on the actions he was supposed to take for the Birds. Amazingly enough, Mr. Guida testified that he had no recollection of preparing the fraudulent Order. When confronted with the facts, Mr. Guida told me that he "clearly did it." Mr. Guida said that he was having trouble forming a mental picture of preparing the fraudulent Order and could not believe that he had done it. Mr. Guida was evasive about it when cross-examined by Mr. Grossman and asked questions by me. At one point, I asked Mr. Guida directly if he was telling me under oath that he had absolutely no recollection of preparing the Order and forging Judge Lidum's signature. His response was equivocal at best. He wanted me to believe that he had blocked it out of his mind. Mr. Guida was a good historian with regard to all of the events surrounding his representation of the Birds with the exception of the fraudulent Order. He also knew that he was ignoring them. Based on listening to the witnesses, evaluating their testimony and considering all of the facts, Mr. Guida knew exactly what he was doing when he prepared the fraudulent Order and knew exactly what he was doing when he ignored and then lied to the Birds about the matter.

I also do not find that he has established by a preponderance of the evidence mitigation with regard to his handling of the money paid by the Birds. It is a simple mechanical matter to appropriately deposit funds paid by a client. His depression and back troubles had absolutely no affect on his failure to properly deposit money.

His medical and psychological problems do in fact mitigate by a preponderance of the evidence his failure to

promptly respond to bar Counsel's inquiry. The inquiries from Bar Counsel came about the time that he began his treatment with Dr. Pasquinelli. He was in severe depression at that time and had been ignoring his practice. (Internal footnotes omitted; some alterations to original).

Petitioner filed a written exception to Judge Plitt's conclusion that a violation of Rule 1.5(a) had not been established by clear and convincing evidence. Conceding that a $735.00 fee, in the abstract, was not unreasonable for the adoption undertaking in this case, Bar Counsel nonetheless argued, citing *Atty. Griev. Comm'n v. Monfried,* 368 Md. 373, 394, 794 A.2d 92, 104 (2002), that the fee was unreasonable because Respondent took no action to follow through properly on the undertaking. As to sanction, Bar Counsel urges disbarment in light of the "unmitigated intentional dishonesty" revealed by the facts underlying the violations of Rules 8.4(c) and (d) primarily, but also taking into account the violations of Rules 1.1, 1.3, 1.4, 1.15(a), and 8.1(b).

Respondent also filed written exceptions to Judge Plitt's findings of fact and conclusions of law. He generally excepted to each determination adverse to his interests on the basis that:

> [Respondent's] position has always been that the conduct occurred, but that it did not legally amount to the Violations alleged because his most serious and utterly [debilitating] mental and physical and health conditions were the root cause of the misconduct and they rendered him utterly unable to conform his conduct in accordance with the law and with Maryland Rules of Professional Conduct.

Also styled as a "general" exception, Respondent, believing that his mitigation evidence in all respects met the preponderance of the evidence standard, complained that it was illogical for Judge Plitt to accept that evidence as mitigating the Rule 8.1(b) violation, but not the other violations. More specifically, Respondent excepted to the findings and conclusions relative to the violation of Rule 1.15(a). His basis was that the fixed fee was earned when paid and, thus, properly deposited

directly into his office account. He also took exception to the findings and conclusions as to the Rule 1.1 violation because he did not deem his failure to follow through or prepare as bearing on competence. Finally, Respondent pleaded that his 30 years at the Bar deserved something less than disbarment. Reiterating his argument that the mitigation evidence proved that he was ill at the time of the unchallenged factual events, he urged that he did what he did solely to "provide his clients' children with a Christmas present," albeit in the form of a fraudulent adoption decree.

## II.

We accept a hearing judge's findings of fact unless we determine that they are clearly erroneous. *Attorney Grievance Comm'n v. Stolarz*, 379 Md. 387, 397, 842 A.2d 42, 47 (2004); *Attorney Grievance Comm'n v. Culver*, 371 Md. 265, 274, 808 A.2d 1251, 1256 (2002). This deference accorded to the hearing judge's findings is appropriate, in part, because the fact finder is in the best position to assess the demeanor-based credibility of a witness. *Stolarz*, 379 Md. at 398, 842 A.2d at 48; *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 17, 741 A.2d 1143, 1152 (1999); *see also* Md. Rule 16–759(b)(2)(B) ("The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses."). The hearing judge is permitted to "pick and choose which evidence to rely upon" from a conflicting array when determining findings of fact. *Attorney Grievance Comm'n v. Fezell*, 361 Md. 234, 253, 760 A.2d 1108, 1118 (2000) (Citation omitted).

In deciding whether the hearing judge's findings of fact are clearly erroneous where exceptions are filed, this Court looks first to Md. Rule 16–759(b)(2)(B), which states that "the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b)." Under Md. Rule 16–757(b), where exceptions to findings of fact are filed by Bar Counsel, we consider that Bar Counsel, before the hearing judge, "ha[d] the burden of proving the averments of the petition by clear

and convincing evidence." *See also Attorney Grievance Comm'n v. DiCicco,* 369 Md. 662, 681, 802 A.2d 1014, 1025 (2002) ("Clear and convincing evidence must be more than a mere preponderance but not beyond a reasonable doubt.") (Internal quotations omitted) (Citations omitted). Thus, where the exceptions are filed to findings that were favorable to the Respondent attorney, under Md. Rule 16–757(b), we consider also that the attorney "who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence." [14] *See also Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 797 A.2d 757, 765 (2002) (stating that "an attorney in a disciplinary proceeding need only establish factual matters in defense of an attorney's position by the preponderance of the evidence, including whether mitigating circumstances existed at the time of the alleged misconduct").

## III.

█ Petitioner's sole exception, as noted previously, is to the hearing judge's failure to conclude that a violation of Rule 1.5(a) occurred when Respondent accepted a $735.00 fee, but did not perform the services for which the fee was collected. We sustain the exception.

---

**14.** Md. Rule 16–710(d) states: "Factual findings shall be supported by clear and convincing evidence." We have previously addressed the relationship of Maryland Rules 16–710(d) and 16–757(b):

[t]he "clear and convincing" standard of Rule [16–710(d)] applies to the measure of proof imposed upon the Attorney Grievance Commission in factual determinations *essential to establishing its case against the attorney.* It does not apply to factual matters sought to be established by the attorney in defense of the attorney's position, including whether mitigating circumstances have been shown. As to this, the preponderance of the evidence standard is the applicable measure of proof.

*Attorney Grievance Comm'n v. Garfield,* 369 Md. 85, 99 n. 13, 797 A.2d 757, 765 n. 13 (2002) (alteration in original) (quoting *Attorney Grievance Comm'n v. Bakas,* 322 Md. 603, 606, 589 A.2d 52, 53 (1991)) (citing *Attorney Grievance Comm'n v. James,* 355 Md. 465, 483, 735 A.2d 1027, 1037 (1999)).

A situation similar to the one at hand was presented in *Attorney Grievance Comm'n v. Monfried*, 368 Md. 373, 794 A.2d 92 (2002). In that case, the attorney collected a flat fee of $1,000 to: meet with the client at the facility where he was incarcerated; obtain a hearing as to the parole revocation that caused him to be incarcerated; and, represent him at the hearing. *Monfried*, 368 Md. at 382, 794 A.2d at 97. Although the attorney did arrange, via telephone, for a hearing to be scheduled, he did not meet with his client, communicate to him or his family the date of the hearing, or attend the hearing. *Monfried*, 368 Md. at 383–84, 794 A.2d at 97–98.

The hearing judge in *Monfried* neglected to conclude whether the attorney violated Rule 1.5(a), as charged, by collecting a fixed fee, but not performing the services. *Monfried*, 368 Md. at 390, 794 A.2d at 101–02. Bar Counsel, on exception, argued to this Court that the fee, in light of the services actually rendered, was unreasonable. The attorney responded that it was a fair fee. *Id.* The Court re-characterized Bar Counsel's argument as one that the fee was unearned. *Monfried*, 368 Md. at 393, 794 A.2d at 103. Relying on *Attorney Grievance Comm'n v. Dietz*, 331 Md. 637, 629 A.2d 678 (1993),[15] the Court concluded in *Monfried* that, "[a]lthough the fee may have been reasonable for the services that [the hearing judge] found were to be provided, Respondent did little or no work for [the client]. Accordingly we hold that the hearing judge was clearly erroneous in failing to find Respondent charged an unreasonable fee in violation of MRPC 1.5." *Monfried*, 368 Md. at 394, 794 A.2d at 104.

Guida's misconduct in the present case leads to a similar conclusion. His lack of effort on behalf of the Birds, after collecting the fee, is manifest. Thus, although $735.00 as a fee for a relatively straightforward adoption may not be unreason-

---

15. In *Dietz*, Bar Counsel argued that Dietz's misconduct in connection with the representation made it unreasonable for him to retain the fee collected. *Attorney Grievance Comm'n v. Dietz*, 331 Md. 637, 647, 629 A.2d 678, 683 (1993). Under the circumstances, the Court agreed that the situation rendered the fee excessive and found a violation of MRPC 1.5. *Id.*

able on its face, in the context of Guida's failure to perform the services to any meaningful degree (and, indeed, to falsify the desired result, even in a misguided effort at concealment of his nonfeasance), the fee became unreasonable. Petitioner's exception is sustained. Guida violated MRPC 1.5(a).

## IV.

■ Regarding Respondent's specific exceptions, we first examine his challenge to the determined violation of MRPC 1.15(a) for not placing the $735.00 initially into his trust account. Admitting that he deposited the money directly into his office operating account, Guida contends nonetheless that there was no violation because it was a "flat fee []earned when it was paid; subject of course to his performance of the agreed upon [l]egal [s]ervices." We overrule this exception.

Inherent in Guida's exception, as framed, are the seeds of its lack of persuasive force. The fee, when paid, was not earned. It was paid for future legal services. As such, it qualified as "trust money" for purposes of MRPC 1.15(a) and should have been deposited in a trust account, not an operating or attorney's office account. This is clear from our decisions in *Attorney Grievance Comm'n v. Blum*, 373 Md. 275, 818 A.2d 219 (2003) and *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 813 A.2d 1145 (2002).

■■ In *Blum*, the hearing judge found that the attorney deposited directly into his personal or operating accounts funds paid to him by clients for future legal services. *Blum*, 373 Md. at 297, 818 A.2d at 232. The funds, we concluded, were not earned when so deposited. *Id.* Funds given in anticipation of future legal services qualify as trust money and, accordingly, are to be deposited in trust accounts separate from the attorney's property, to be removed promptly by the attorney as earned. *Blum*, 373 Md. at 298–99, 818 A.2d at 233. To deposit such trust money into the attorney's personal or operating accounts before the fees are earned constitutes a violation of MRPC 1.15(a). *Id.* at 299, 818 A.2d 219, 818 A.2d

at 233; *see also McLaughlin,* 372 Md. at 504, 813 A.2d at 1167.

■ Guida's other specific exception related to the findings and conclusion that he violated Rule 1.1. He contends that his admitted failures to be thorough, prepare, and follow through on pursuit of the adoption did not constitute incompetence within the meaning of the Rule. He points to Judge Plitt's finding that "[t]here is no evidence that Mr. Guida did not possess the legal knowledge or skill to handle the adoption matter." We overrule this exception.

■ Rule 1.1. is framed in the affirmative, outlining generally the principle that a "lawyer shall provide competent representation to a client." It then defines the elements of competent representation: legal knowledge, skill, thoroughness, and preparation "reasonably necessary for the representation." Although Judge Plitt found that Petitioner adduced no evidence as to Guida's shortcomings regarding the knowledge and skill elements, the hearing judge, based on Guida's concessions and Bar Counsel's evidence, found that Respondent utterly failed to satisfy the thoroughness and preparation elements. Evidence of a failure to apply the requisite thoroughness and/or preparation in representing a client is sufficient alone to support a violation of Rule 1.1. *See Attorney Grievance Comm'n v. Zdravkovich,* 362 Md. 1, 22–23, 762 A.2d 950, 961–62 (2000); *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 74, 753 A.2d 17, 26–27 (2000).

## V.

### A.

■ We shall consider Respondent's general exceptions as part of our analysis of the sanction, if any, to be imposed in this case. It is appropriate to do so because Respondent's general exceptions proclaim that his mitigation evidence established, by a preponderance of evidence, that "his most serious and utterly debilitati[ng] mental and physical and health conditions were the root cause of the misconduct and they ren-

dered him utterly unable to conform his conduct" to the requirements of the MRPC. Moreover, although it is for this Court to decide what to make of mitigation evidence in a given case, Guida points out a perceived inconsistency in how Judge Plitt treated the mitigation evidence. Specifically, Guida argues that

[the hearing judge's] bifurcated findings that Mr. Guida established mitigation by a preponderance of the evidence to some charges but not others are inconsistent with the facts and illogical. They are of little help to this Court.

Either Mr. Guida was disabled or he was not. It is improper to decide his disabilities mitigate some of the conduct (i.e. violations of Disciplinary Rules 1.1 [this Rule was not specifically mentioned either way, so it is assumed mitigation was proved] and 8.1) but not all of it (i.e. violations of Disciplinary Rules 1.3, 1.15, 1.4, and 8.4).

Judge Plitt said that the uncontradicted medical evidence established mitigation. If it was established, it had to be by a preponderance as to the entire case. Otherwise, he would have said it had not been established. There is no middle ground between *not proven* and *proven* called *established.*

Neither Dr. Tellefsen (who was recommended to Mr. Guida's Attorney by Bar Counsel), nor Dr. Pasquinelli, said anything that would support Judge Plitt's bifurcated findings. Bar Counsel presented no medical evidence.

█ Mitigation, which a respondent attorney need prove only by a preponderance of the evidence, has been analyzed traditionally by the Court in terms of American Bar Association's recommended standards. For example, in *Attorney Grievance Comm'n v. Glenn,* we stated:

The mitigating factors listed in the ABA Standards include: absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation;

physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses. (Footnote omitted).

341 Md. 448, 488–89, 671 A.2d 463, 483 (1996); *see also Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375, 872 A.2d 693, 713 (2005). As such, "facts tending to show mitigation are used to determine the severity of the sanction and not whether evidence adduced has established a violation of the rules by clear and convincing evidence." *Zuckerman*, 386 Md. at 368, 872 A.2d at 709.

 We intentionally set a high bar for a respondent in a case where the flagship violation is of Rule 8.4(c) ("conduct involving dishonesty, fraud, deceit or misrepresentation") before we will excuse or mitigate the sanction of such a violation based on the respondent's mental or physical condition at the time of commission of the conduct constituting the violation. That high bar is described best in *Attorney Grievance Comm'n v. Vanderlinde*, 364 Md. 376, 413–14, 773 A.2d 463, 485 (2001).

In cases of intentional dishonesty, misappropriation cases, fraud stealing, serious criminal conduct and the like, we will not accept, as compelling extenuating "circumstances," anything less than the most serious and utterly debilitating mental or physical health conditions, arising from any source that is the "root cause" of the misconduct and that also result in an attorney's utter inability to conform his or her conduct in accordance with the law and the MRPC.

*Vanderlinde* explained why the bar was set at that height:

Unlike matters related to competency, diligence and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. Honesty and dishonesty are, or are not, present in an attorney's character. Disbarment ordi-

narily should be the sanction for intentional dishonest conduct.

*Id.* 418, 773 A.2d at 488.

### B.

The uncontradicted summary of Respondent's relevant history, as related by Dr. Tellefsen, was that, before 1999, he was relatively healthy, led a happy family and professional life, and engaged in several extracurricular pursuits. When his father died in 1999, he began to withdraw from his family and hobbies, neglect his law practice, and put on weight, approximately 100 pounds over a couple of years. By the time he was engaged by the Birds in July 2002, Guida, as opined by Dr. Tellefsen, likely was suffering from severe major depression, together with physical maladies associated with his obesity, i.e., back pain and neurological problems.[16]

In her direct examination testimony at the hearing before Judge Plitt on 18 March 2005, when asked by Respondent's counsel whether, in December 2002 when he forged the order of adoption, Guida's "medical and/or mental condition would have interfered with his ability to appreciate that that conduct was wrong," Dr. Tellefsen stated, in pertinent part:

I don't think there was anything about his condition that would have impaired his ability to understand the difference between doing something that's right and doing something that's wrong. I don't think that he would have not known that what he was doing in signing that name was a bad thing to do if not actually illegal.

\* \* \*

I don't think there is anything that would say that he didn't know that in his head that that's what he was doing. The problem is that his thinking at the time was affected by his depression, was disturbed by his depression and his

---

**16.** Guida, due to an injury, underwent back surgery for disc herniation in May 2003.

ability to rationalize and appropriately, inability to appropriately rationalize became impaired and his thinking was affected by the level of depression that he had. So in his mind he gets the idea he's doing something that's a good thing at the moment because he is trying to make the client happy by getting this order to them by Christmas. That's the way I remember this, that it was important to the family they have this for a Christmas present for their child.

\* \* \*

So while I can't say he didn't' know it was wrong, I do think that the depression was the source of the conduct itself.

During cross-examination, Bar Counsel elicited from Dr. Tellefsen the following points: (1) despite his increased depression after mid–2002 and the cognitive defects [17] he was experiencing, Guida knew he was not performing the legal services for which he had been engaged by the Birds and that he misrepresented to them that he was working on the matter nonetheless; and (2) he knowingly constructed the fabricated adoption order and sent it to the Birds with an original note misrepresenting further that he had the original order in his possession to cover-up the fraud. Also during the time period of greatest depression, according to Dr. Tellefsen, Respondent nonetheless was able apparently to pay his withholding taxes when due ("he told me he didn't have any trouble with that").

Ultimately, Bar Counsel and Dr. Tellefsen engaged in the following exchange:

Q. Can you explain why in this one case there was this dishonest act when in other cases at least with respect to the hard evidence that there is any indication he had done it?

A. Yes. Actually, I think I can.

---

**17.** Dr. Tellefsen explained the "cognitive defects" manifesting themselves in Guida, as: delayed processing speed for information, an inability to concentrate, inability to maintain attention to tasks, and low motivation to approach office work.

Q. Is that because he wanted to do something for the clients because it was coming up to Christmas?

A. Mr. Guida is Italian, he is Catholic, Jesuit education, family man, lots of kids. This is a client that comes to him saying they want this order for this kid for Christmas. I think that that just says it all. I think that that is the driving force of this bizarre behavior.

Q. Wouldn't you call that the root cause?

A. That, you know, I mean, that's the rocket on the launch pad and the depression that he has is the rocket fuel and, you know, I guess Christmas is the match that lights the whole thing up.[18]

During the latter half of 2002, after engagement by the Birds, he claimed to have taken with him to Cecil County the adoption file in order to file the petition in the Circuit Court on at least two different occasions, but left the file in the car while he attended to other clients' cases in the District Court. He explained that when he returned to the car each time his back acted up and he could do nothing but sit in his car worrying over his inability to walk, until after the courthouse closed each day. It was during his recovery from the May 2003 back surgery that he realized that he suffered from depression.[19] His wife threatened to leave him if he did not seek help. This was the impetus to consult Dr. Pasquinelli in August of 2003.

During cross-examination of Respondent, the following transpired, in pertinent part:

---

18. Respondent also produced the testimony of Dr. Gary Pasquinelli, a psychologist. Guida began seeing Dr. Pasquinelli in August 2003 for psychotherapy. Dr. Pasquinelli testified to various anti-depressants Guida was prescribed by an unnamed primary care physician and how, over the course of psychotherapy, Respondent's mood had improved.

19. His explanation left somewhat unclear whether these failures to file the adoption petition were attributable to his back pain, his difficulty in walking, or his late-recognized depression.

**60**

THE COURT: Are you telling me that you have absolutely no recollection of preparing a fraudulent court order and forging Judge Lidum's signature on it? Yes or no.

A [Mr. Guida]: Yes, I have a recollection of that.

THE COURT: Ask your next question.

Q [Bar Counsel]: Did you not tell Dr. Tellefsen that you did not have a recollection of it?

A [Mr. Guida]: It depends on when we are talking about.

\* \* \*

Yes, I told Dr. Tellefsen I did not have a recollection of preparing, of actually signing that and I still don't have a recollection in my mind or a picture of myself doing it. However, when I looked at it I knew that it was me. I knew from the signature and the notes and that's how I am saying yes I did. You know, maybe that's splitting hairs. I don't know.

Q [Bar Counsel]: Well, I am not sure that the answer you just gave is consistent with the answer you gave to His Honor. Maybe we can make it a little sharper. Do you recall, I think my first question was executing the pseudo order, actually signing the judge's name, do you recall that?

A [Mr. Guida]: I only recall that in retrospect. I mean, that's what I can tell you. I can't—

Q [Bar Counsel]: What does that mean?

A [Mr. Guida]: It means when Mrs. Bird, maybe if you will allow me to answer it this way. In June of '03 when I was recuperating from surgery Mrs. Bird I believe wrote to you at that time and then I saw the complaint. It was at that particular time when I looked at it that I said I can't believe that I did that. But I acknowledged to myself that I did it.

Now, did I recall it in December of '02? I seem to have blocked that out. I honestly seem to have blocked out that I actually sat down and signed that thing.

Q [Bar Counsel]: Why did you answer Judge Plitt's question with a yes you do remember?

\* \* \*

A [Mr. Guida]: Because I know that I did it and I am not trying to say that I did not do it.

Q [Bar Counsel]: But you don't recall the actual circumstances?

A [Mr. Guida]: I don't recall the mind set I had at the time when it happened. When I saw it in June of '03, I guess that's six months later. I couldn't believe that I had done that. I honestly couldn't believe that I had done that.

## C.

In *Attorney Grievance Comm'n v. Davis,* we explained:

Our consideration of the appropriate disciplinary measure to be taken in any given case involving violation of the Rules of Professional Conduct is guided by our interest in protecting the public and the public's confidence in the legal profession. The purpose of such proceedings is not to punish the lawyer, but should deter other lawyers from engaging in similar conduct. The public is protected when we impose sanctions that are commensurate with the nature and gravity of the violations and the intent with which they were committed.

375 Md. 131, 166–67, 825 A.2d 430, 451 (2003).

Respondent argues that, having concluded that he proved by a preponderance of the evidence that he suffered from a severe major depression [20] during the time he represented the Birds, Judge Plitt was bound by logic and consistency to find complete mitigation of all of his misconduct, not merely of select violations of the MRPC. Although we agree, on this record, with the general "all-or-nothing" approach of Respondent's argument, we conclude that the mitigation evidence

---

**20.** Although there was evidence adduced that Guida experienced weight gain from his depression, which may have led to his back and leg problems, as well as a host of other obesity-related systemic problems, the expert testimony focused on depression as the chief mitigator of the misconduct in Respondent's representation of the Birds.

does not rise to the level of excusing or mitigating any of Respondent's violations.

Dr. Tellefsen's testimony may have satisfied a "but for" standard, i.e., Guida would not have falsified the adoption order but for his depression. Yet, since we decided *Vanderlinde*, that is not sufficient in cases of intentional dishonesty, deceit, or misrepresentation, to dilute the ordinary sanction of disbarment for such violations. The level of proof to satisfy the *Vanderlinde* threshold is

> there ... needs to be almost conclusive, and essentially uncontroverted evidence that would support a ... finding not only that the attorney had a serious and debilitating mental condition, but that the mental condition, in a sustained fashion, affected the ability of the attorney in normal day to day activities, such that the attorney was unable to accomplish the least of those activities in a normal fashion. Unless that standard is met the impairment is not the "root cause" of the misconduct.

*Vanderlinde*, 364 Md. at 418–19, 773 A.2d at 488.

The totality of Dr. Tellefsen's testimony, as well as Guida's own testimony, revealed that Respondent contemporaneously knew that what he did in falsifying the adoption order and Judge Lidum's signature was wrong. Dr. Tellefsen's actual examination of Guida's ability otherwise to perform day-to-day tasks in his law practice during the relevant time was inadequate, although she opined pessimistically in that regard. Nonetheless, she did indicate that he apparently managed to pay his withholding taxes. Guida's own testimony evinced that he represented other clients at the same time that he was supposed to be representing the Birds. *See* n. 21 *infra.* Our review and consideration of this record leaves us persuaded only that, while Respondent suffered from a severe major depression at the relevant times, his depression (and related sequelae) was not so great that it satisfied the *Vanderlinde* threshold for mitigation of the sanction for his violations of the MRPC.

We are not unmindful of other mitigating factors that appear on this record. Although it was disclosed that Respondent had been the subject of a Conditional Diversion Agreement with Petitioner regarding a complaint from 2000 or 2001 regarding preparation of a deed, that Agreement was discharged successfully in June 2003.[21] Respondent expressed contrition and remorse for his misconduct and refunded to the Birds the fee they paid him. He was forthcoming in the complaint resolution process, although initially failing to respond in timely fashion to Petitioner's inquiry. Yet, at bottom, Respondent fails to persuade us that something short of disbarment is appropriate in order to protect the public and deter other attorneys from similar misconduct.

Respondent engaged in intentional dishonesty and deceit that undermines the trust that must be at the center of the lawyer-client relationship. This Court has stated that intentional dishonest conduct by an attorney is "almost beyond excuse" and that disbarment should ordinarily be the sanction for such conduct. *Vanderlinde*, 364 Md. at 418, 773 A.2d at 488. *See Attorney Grievance Comm'n v. Bennett*, 304 Md. 120, 497 A.2d 1140 (1985) (holding that forging a judge's name on court document warrants disbarment). In this case, we find that disbarment is the appropriate sanction.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–515(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOSEPH M. GUIDA.

---

21. In the course of completing successfully the external monitoring of his law practice called for in the Agreement, which included the time period of his representation of the Birds, Guida apparently was able to demonstrate the ability to maintain his law practice generally. The attorney who served as monitor under the Agreement also represented Guida in the instant case.