57 A.3d 976

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Charles Stephen RAND.

Misc. Docket AG No. 50, Sept. Term, 2011.

Court of Appeals of Maryland.

Dec. 21, 2012.

Raymond A. Hein, Deputy Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

Alan M. Wright, Sandy Spring, Maryland, for respondent.

Argued before BELL, C.J. HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

BATTAGLIA, J.

Charles Stephen Rand, Respondent, was admitted to the Bar of this Court on December 14, 1973. On October 25, 2011, the Attorney Grievance Commission ("Bar Counsel"), acting pursuant to Maryland Rule 16–751(a),[1] filed a "Petition for Disciplinary or Remedial Action" against Rand, which incorpo-

---

1. Rule 16–751(a) provides in relevant part:

   (a) **Commencement of disciplinary or remedial action.**

rated two complaints. Both the first complaint filed by Lieutenant Bernard Wade and the second, filed by Lieutenant Clarence Lunsford, related to Rand's representation of a group of correctional officers in a pay dispute with Montgomery County. Bar Counsel filed an amended petition on January 17, 2012, and, on February 29, 2012, a second amended petition, in which he deleted some of the allegations contained in the first amended petition.

In the second amended petition, Bar Counsel alleged that Rand had violated Maryland Rules of Professional Conduct 1.1 (Competence),[2] 1.3 (Diligence),[3] 1.4 (Communication),[4] 1.5 (Fees),[5] 1.15 (Safekeeping Property)[6] and 8.4(d) (Misconduct)[7] by failing to inform complainant Lunsford that he was not able

---

(1) Upon approval or direction of Commission. Upon approval or direction of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

**2.** Rule 1.1 provides:

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

**3.** Rule 1.3 provides:

A lawyer shall act with reasonable diligence and promptness in representing a client.

**4.** Rule 1.4 provides:

(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
(2) keep the client reasonably informed about the status of the matter;
(3) promptly comply with reasonable requests for information; and
(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

**5.** Rule 1.5 provides, in pertinent part:

to become a party to the grievance Rand had filed on behalf of a group of lieutenants that included Lieutenant Wade, because Lieutenant Lunsford had not joined the suit in time. Bar Counsel also alleged that Rand failed to communicate properly with the group of lieutenants during the course of the repre-

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.
(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except where the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

6. Rule 1.15(d) provides in relevant part:
(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

7. Rule 8.4 provides in relevant part:
It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, ... or do so through the acts of another;
* * *
(d) engage in conduct that is prejudicial to the administration of justice;

sentation and that Rand attempted to collect fees on behalf of his former law firm at a time during which the firm was in default for failing to pay taxes. Rand's collection efforts, Bar Counsel alleged, constituted a violation of Rule 1.5 as well as conduct prejudicial to the administration of justice, in violation of Rule 8.4. In an Order dated November 1, 2011, we referred the two complaints, which had been consolidated into one Petition for Disciplinary or Remedial Action by Bar Counsel, to Judge Richard E. Jordan of the Circuit Court for Montgomery County for a hearing, pursuant to Rule 16–757.[8] Subsequent to our order transferring the case to the Circuit Court but prior to trial, Bar Counsel twice amended its petition.

---

**8.** Rule 16–757 provides:

(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action.

(b) **Burdens of proof.** The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence.

(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

(d) **Transcript.** The petitioner shall cause a transcript of the hearing to be prepared and included in the record.

(e) **Transmittal of record.** Unless a different time is ordered by the Court of Appeals, the clerk shall transmit the record to the Court of Appeals within 15 days after the statement of findings and conclusions is filed.

After discovery occurred, a hearing ensued that took four days, in which Judge Jordan heard testimony from Lieutenant Lunsford, Lieutenant Wade, other members of the group of lieutenants, the Associate County Attorney involved in the grievance proceeding, two expert witnesses on fees, and Rand himself. Based on that testimony and the documents admitted into evidence, Judge Jordan issued the following Findings of Fact and Conclusions of Law:

## STATEMENT OF FINDINGS OF FACT AND CONCLU-SIONS OF LAW

Pursuant to an Order of the Court of Appeals of Maryland dated November 1, 2011, the above-captioned matter was transmitted to the Circuit Court for Montgomery County to be heard and determined by the undersigned judge pursuant to Maryland Rule 16–752(a). The case came before this circuit court for trial from March 12 through March 15, 2012. It proceeded on the Second Amended Petition for Disciplinary or Remedial Action ("Petition") filed by the Attorney Grievance Commission of Maryland ("Petitioner") against Charles S. Rand ("Respondent" or "Rand") on March 5, 2012. The Petition claimed Respondent, by his alleged acts and/or omissions, violated the following Rules of Professional Conduct: 1.1 (Competent Representation); 1.3 (Diligence); 1.4 (Communication); 1.5(a) (Fees—Reasonableness); 1.5(b) (Fees—Communication); 1.15(d) (Fees—Accounting); 8.4 (Professional Misconduct—violation of Rules of Professional Conduct and conduct prejudicial to the administration of justice).

Over the course of four days, the court took testimony from the Respondent, some of his former clients and other witnesses, received numerous exhibits, and heard argument. Since then, the parties have submitted to the court their proposed findings of fact and conclusions of law.

In making its factual findings on Petitioner's averments, the court will apply the standard of proof of clear and convincing evidence, while Respondent's affirmative defenses and any applicable matters of mitigation or extenuation

will be subject to the preponderance of the evidence standard.  Md. Rule 16–757(b).

## FINDINGS OF FACT

### A.  The Underlying Case and Attorney–Client Relationship

*Background of Underlying Case and Respondent's Retention*

Respondent Charles S. Rand is a 63 year-old attorney who received his undergraduate education at the University of North Carolina and his law degree from the University of Baltimore Law School.  He was admitted to the Bar of the Court of Appeals of Maryland in December, 1973.  He is also licensed to practice law in the District of Columbia and before several federal courts.  From 1974 until 1980, he worked as an Assistant County Attorney in Montgomery County and, since then, has been in private practice in Rockville as a general civil trial practitioner.  During most of the time relevant to this case Respondent operated his law practice as a professional corporation in the name of McKernon & Rand, P.A., which was established on April 6, 2001.

In 2005, Montgomery County opened a new jail facility in Boyds, Maryland (the Montgomery County Correctional Facility, or "MCCF").  With the significant expansion of jail space and inmate population that came along with the new facility, Montgomery County expanded and reorganized its correctional staff.  In this process, it promoted several master correctional officers to the newly created position of "sergeant," entitling them to a ten percent (10%) pay increase.  Thereafter, such sergeants could receive an additional ten percent (10%) pay increase if promoted to lieutenant.  This created a potential inequity in pay (called "pay compression") for more senior correctional lieutenants who would then be making lower wages than the newly promoted lieutenants.

In early June, 2005, Bernard Wade, one of the aggrieved lieutenants, met with Respondent, and shortly thereafter Respondent met with veteran lieutenants at MCCF to discuss possible representation of them in the pay compression dispute. At a subsequent meeting at MCCF on or about June 11, 2005, Respondent and an associate attorney met with twelve lieutenants who all printed their names on a "Memorandum of Understanding" (Petitioner's Exhibit No. 7, hereinafter referred to as the "MOU") reflecting that they "desire[d] representation by McKernon & Rand, P.A." and setting forth the anticipated terms of representation.

The MOU specified anticipated fees and the scope of representation. In its subject line, it noted "Pay Compression." The first paragraph of the Memorandum stated in the form of a "WHEREAS" clause that the document was "to memorialize the preliminary understanding between McKernon & Rand, P.A. and those lieutenants of the Montgomery County Department of Correction and Rehabilitation with regard to representation in connection with issues related to pay compression and/or disparate treatment of employees and/or disproportional pay compared to duties." Next, the MOU contemplated in express terms, *inter alia*, that (1) each lieutenant would submit a $500.00 retainer payment; (2) "representation will be provided at a discounted hourly basis of $175.00" for Respondent and "150.00 for Devin M. Swaney, Esq." (Respondent's associate at the time); and (3) "in consideration of the discounted hourly rate, representation will also be provided on a contingent basis in that McKernon & Rand, P.A. will have a right to one-third (1/3) of any awards, proceeds, retroactive salary, etc." In its final clause and just above the printed names of the twelve lieutenants, it stated that Respondent's firm "will draft written retainer agreements with regard to the issues discussed and on the terms herein described for execution by the following undersigned persons."

Following the MOU a detailed Retainer Agreement was prepared by Respondent's firm (Petitioner's Exhibit No. 8) and was apparently emailed to 11 lieutenants by Respon-

dent's associate on June 14, 2005 (Petitioner's Exhibit No. 9). The email asked that interested lieutenants for whom Respondent's firm did not have an email address be forwarded a copy of the agreement and that all those "willing to move forward according to the terms discussed by Mr. Rand last Saturday" sign the "Retainer.doc" attachment to the email. The email suggested the "two options" of returning the signature page and a retainer check to either Lt. Ezunagu or directly to Respondent's office. In addition, the June 14, 2005 email requested that the lieutenants elect a group of two or three persons to "make executive decisions" for the group and to "be our point of contact." The email then stated (p. 1–2) that "[u]ntil I hear differently, I assume Lt. Ezunagu is our point of contact."

Respondent testified that he did not receive any signed Retainer Agreements from the lieutenants, but he went forward anyway with their case and treated the MOU as a retainer agreement, noting that he was on a "short time fuse" of 20 days within which to file grievances under the County's personnel procedures in order to preserve a timely challenge to the pay compression issue.

Respondent's firm did timely receive $500 individual retainer checks from 11 of the 12 lieutenants who had signed the MOU. The one lieutenant from the MOU list who did not remit a retainer payment was Clarence Russell Lunsford (hereafter "Lunsford"). Lunsford initially intended to retain Respondent, but some time after the June 11, 2005 group meeting he decided not to do so. Matters regarding Lunsford will be discussed in detail later in this Statement.

*Filing of Grievances and Subsequent Progress of Underlying Case to the MSPB*

On July 5, 2005, Respondent's associate, Devin Swaney, filed 11 grievance forms with attached grievance statements, with the Montgomery County Office of Human Resources ("OHR"). No grievance was filed on behalf of Lunsford, who had not paid Respondent's retainer or signed a Retain-

er Agreement and, therefore, was not Rand's client at the time.

On August 8, 2005, OHR's Director, Joseph Adler, notified Swaney by memorandum that OHR was consolidating the eleven grievances filed by Respondent's office with three additional grievances regarding the same issue filed in proper person by other lieutenants. Adler's memo further advised that the consolidated grievances thereafter should be captioned based on the name of one of the grievants as "Timothy Carroll, *et al.*" The consolidated grievances thus came to be known in future filings and communications as the "Carroll case" or "Carroll matter."

In a memorandum dated August 23, 2005, Mr. Adler addressed the merits of the consolidated grievances. He found that the establishment of a new sergeant class, which had the effect of narrowing the salary spread between the lieutenants and the newly promoted sergeants, did not constitute a pay inequity and therefore denied the relief requested. Respondent then appealed OHR's decision to the County Attorney's Office (OCA) where the claims languished inactive for several months. On December 6, 2005, Respondent contacted OCA to inquire about the delay in receiving a decision, at which time he learned that OCA was trying to resolve a similar grievance from the Montgomery County Sheriffs Office. Respondent and the OCA then discussed possible alternative dispute resolution of the 11 Lieutenants' claims. ADR did not soon occur and Respondent was informed by the OCA that it could not take place until the end of January 2006. On January 25, 2006, Respondent again contacted the OCA but obtained no response. He then filed an appeal of the Lieutenants' claim to the county's Merit System Protection Board ("MSPB").

The OCA then challenged the MSPB's jurisdiction as premature. However, the Board rejected that challenge, finding the OCA's inaction unjustified, and the MSPB took jurisdiction of the appeal on its merits. On September 13, 2006, the MSPB issued its Final Decision and Order in the Carroll matter. The Board concluded that it lacked authori-

ty to grant relief "absent a showing that [the grievants'] salary is somehow violative of law or regulation," and then went on to conclude there was no such violation.

On October 13, 2006, Respondent appealed the MSPB decision by filing a Petition for Judicial Review of Administrative Action in the Circuit Court for Montgomery County.

*"Grievance II"*

On August 8, 2006, while the "Carroll" claim was pending before the MSPB, Respondent filed a new set of grievance forms with the Montgomery County OHR on behalf of the Lieutenants. The new grievances (identified collectively by Respondent's law firm as "Grievance II") were based upon a 1988 OHR memorandum regarding a pay compression issue affecting correctional officers. The Grievance II matter never progressed beyond its initial filing at OHR. By agreement of the parties, it was held "in abeyance" pending the outcome of the Carroll claims, but, ultimately, it was never pursued or resolved.

*Unilateral Pay Adjustment by the County*

The administrative appeal of MSPB's decision remained pending before the Circuit Court for more than a year. During that period, in April 2007, Montgomery County unilaterally and voluntarily announced adjustments to the salaries of corrections lieutenants. The County took this action in an effort to address the pay compression issue and to reduce the County's potential exposure should there be any award of retroactive back pay to any of the grievants in the Carroll case.

All corrections lieutenants who held that rank before the 2005 sergeant classification and the resulting pay compression issue received the benefit of the County's unilateral salary adjustment regardless of whether or not they were grievants in the Carroll case. Clearly, Respondent's pursuit of the case for the Lieutenants' group provided critical impetus for the County's decision to make the pay adjustment.

*Decision of the Circuit Court*

Following the submission of written memoranda by Respondent on behalf of the Lieutenant's group and the OCA on behalf of the County, a hearing was held in the Circuit Court on November 15, 2007. Judge David Boynton heard arguments from counsel and took the matter under advisement. On November 26, 2007, Judge Boynton signed an Order affirming the decision of MSPB.

*The Attorney/Client Relationship Deteriorates*

While the matter was pending in the Circuit Court in the Fall of 2007, the relationship between Rand and his clients deteriorated. First, Lieutenant Wade (one of the Executive Committee members) disagreed with Rand's handling of the Circuit Court ruling. Wade wanted Rand to seek a reconsideration of the ruling, rather than appeal it to the Court of Special Appeals. As a second point of dispute, around and before this time, Rand became assertive in trying to collect fees he contended the Lieutenants owed him.

During this period of time, Wade testified that he telephoned and faxed documents to Rand on an unspecified date in September 2007, emailed him on October 4, 2007 (Petitioner's Exhibit No. 18), and sent him a letter by an email (Petitioner's Exhibit No. 20) certified on October 16, 2007 (Petitioner's Exhibit No. 19). In these communications, Wade expressed disagreement with Rand's strategies, irritation that Rand met with the County Attorney without any of his lieutenant clients present, and anger that he failed to schedule a meeting with the County Executive to try to resolve the pay compression dispute with a political approach. Wade testified that Respondent ignored his communications until responding with a memorandum to Wade and Ezunagu dated October 22, 2007 (Petitioner's Exhibit No. 21), which addressed Wade's issues, as well as pressing the fee demand. The Rand memo also proposed a meeting with Wade and Ezunagu to discuss the issues raised by Wade and to set a "common goal." Wade testified he did

not receive this communication even though the memorandum was addressed to him. However, Wade did acknowledge that "around this time frame" he and Respondent were in contact with each other.

On November 13, 2007, Respondent sent a letter (Petitioner's Exhibit No. 21) to the entire Lieutenant group at their residences (another communication Wade denies receiving) requesting payment of a fee as adjusted in consultation with the Executive Committee at a meeting he held with them a few days before. His letter also explained his assessment of the status of the case, opined that the County's voluntary salary adjustment was substantial, and addressed other issues. The letter stated that a "detailed billing history of my work for you is available to you upon request." Wade testified he asked for billing documentation, but was denied such for "months." It is unclear from Wade's testimony when this request was made and how and when Rand responded, but office records from the "PC Law" billing software program were produced. Wade contended Rand was owed no additional fees. It is clear that the attorney client relationship had declined to the point of animosity, which the court perceived continued through the trial of this case.

*Respondent's Withdrawal*

After losing the administrative appeal in the Circuit Court and then noting a timely appeal to the Court of Special Appeals, Respondent sent a letter (Petitioner's Exhibit No. 24) to all the Lieutenants at their home addresses on May 21, 2008 notifying them of his intention to withdraw from the case. Thereafter, on June 5, 2008, he filed motions to withdraw his appearance in the Court of Special Appeals, the Circuit Court for Montgomery County and MSPB. The Court of Special Appeals and the Circuit Court granted Respondent's motions in July 2008. Again, Wade also denies receiving the May 21 letter and then not knowing of Respondent's withdrawal until receiving notice of it from the Court of Special Appeals.

*Hiring of New Counsel and Subsequent Developments*

Upon Respondent's withdrawal from representation, the Lieutenants retained David Slade, Esquire (hereafter "Slade") to take over their case. On January 9, 2009, the Court of Special Appeals filed an unreported opinion reversing the judgment of the Circuit Court and concluding that it had erred in upholding the erroneous conclusion of the MSPB that it lacked authority to grant the relief for pay compression. On March 10, 2009, the mandate of the Court of Special Appeals was issued, followed on June 30, 2009 by a remand by the Circuit Court to MSPB for further proceedings before that entity consistent with the appellate decision. On April 26, 2010, following further proceedings, MSPB issued a Supplemental Final Decision and Order adjusting the pay rate for all lieutenants and awarding compensation (an award of retroactive back pay) to seven of the Lieutenants who were then still pursuing relief.

Lieutenant Lunsford, who did not file a timely grievance and retained Respondents eleven months after the other Lieutenants, did not receive a back pay award because he had failed to exhaust his administrative remedies. In an attempt to seek back pay redress for Lunsford after the MSPB's Final Decision, Attorney Slade filed with MSPB a Petition for Reinstatement of Lunsford as a grievant (essentially a motion for reconsideration). On May 19, 2010 the MSPB denied Lunsford's request.

## B. Petitioner's Claims of Respondent's Misconduct

The Second Amended Petition for Disciplinary or Remedial Action against Respondent is based on the following alleged circumstances and Rules of Professional Conduct violations:

1. The Respondent operated his law firm while its corporate charter was forfeited, including while he represented and sought fees from the Lieutenant group. [Rule 1.5(a)—Fees, Reasonableness; Rule 8.4(a) and (d)—Professional Misconduct, violation of Rules of Professional

Conduct and conduct prejudicial to the administration of justice];

2. The Respondent, while charging him attorney's fees, failed to file a grievance on behalf of Clarence Russell Lunsford or a motion to allow him to join the Lieutenants' case while it was pending, failed to advise Lunsford of the consequences of a timely pay compression grievance not having been filed on his behalf, and failed to adequately explain to Lunsford the distinction between the Carroll case and the "Grievance II" matter. [Rule 1.1—Competent Representation; Rule 1.3—Diligence; Rule 1.4—Communication; Rule 1.5(a)—Fees, Reasonableness; Rule 8.4(d)—Professional Misconduct, conduct prejudicial to the administration of justice];

3. The Respondent failed to keep the Lieutenants reasonably informed and to be responsive to the Lieutenants' inquiries about the status of their case and of billing by Respondent particularly when the case was pending in the Circuit Court on the administrative appeal. [Rule 1.4—Communication];

4. The Respondent charged unreasonable attorney's fees, both hourly and contingency, and failed to maintain proper statements and/or ledgers to support his firm's bills. [Rule 1.5(a)—Fees, Reasonableness];

5. The Respondent failed to render an accounting to each of the individual Lieutenants. [1.15(d)—Fees, Accounting];

6. The Respondent failed to secure a separate retainer agreement for the "Grievance II" matter. [1.5(b)—Fees, Communication].

## CONCLUSIONS OF LAW

The court will address the alleged wrongful acts and violations in the order set forth immediately above.

*1. The Corporate Charter Forfeiture Issue*

On April 6, 2001, Respondent established McKernon & Rand, P.A. as the business entity under which he operated his law firm. On October 8, 2004, the firm's corporate charter was forfeited due to its failure to file a personal property tax return for 2003; however, Respondent continued to practice law in the name of the forfeited entity until September 10, 2007, when he established McKernon Rand, LLC as the operating entity for his law practice. Therefore, Rand's corporate charter was in forfeited status when he was handling the Lieutenants' claims and thereafter pressing for payment of attorney's fees.

Petitioner cites the court to Corporations and Associations Article § 3–514 which provides as follows.

§ 3–514. *Prohibition against doing business after forfeiture*

(a) Prohibition.—Any person who transacts business in the name or for the account of a corporation knowing that its charter has been forfeited and has not been revived is guilty of a misdemeanor and on conviction is subject to a fine of not more than $500.

(b) Presumption.—For the purpose of this section, unless there is clear evidence to the contrary, a person who was an officer or director of a corporation at the time its charter was forfeited is presumed to know of the forfeiture.

Md.Code Ann., Corps. & Ass'ns. § 3–514

Respondent testified that he did not know about the corporate forfeiture. The Respondent's testimony in this regard is credible and is supported by the logic that a small tax payment could have been made and simple procedures followed to reinstate the corporate entity. See Md.Code Ann., Corps. & Ass'ns. § 3–507. Respondent's office management staff during the relevant times also testified that they did not know about the corporate forfeiture. While the evidence at trial reflects Respondent's negligence in failing to file a property tax return and practicing in the name of a forfeited entity, there is clear evidence that Respondent did

not have actual knowledge of the forfeiture while he represented the Lieutenants and for a significant time thereafter.

Respondent, however, was clearly placed on notice of the forfeiture on October 16, 2008. On that day, Respondent testified at the trial of a lawsuit filed by him individually and on behalf of McKernon & Rand, P.A. in the Circuit Court for Montgomery County (*Charles S. Rand, et al. v. Steven Steinberg,* Case No. 281829–V). The suit sought attorney's fees from a former client. During questioning by opposing counsel at the trial of that case, Rand was shown documentation from the Maryland Department of Assessments and Taxation certifying that the corporate charter of McKernon & Rand, P.A. had been forfeited on October 8, 2004 and that the corporation was not in good standing. Similar documentation was also attached to the Defendant's Motion for Judgment filed during that trial. Therefore, as of October 16, 2008, Respondent clearly had actual knowledge that the corporate charter had been forfeited. He took no steps after that date to have the charter revived, and he continued operating under the new LLC he had created the prior year.

After actual knowledge of the forfeiture of the corporate charter and while operating under the firm's successor LLC, Respondent attempted to collect attorney's fees from Lieutenants (then his former clients) in the name of McKernon & Rand, P.A. He engaged attorney Jill Caravaggio, Esquire to pursue collection efforts on behalf of the firm. On January 21, 2009, Caravaggio sent a letter to Wade, Ezunagu, Lunsford and eight other former Lieutenant clients stating that she had been "expressly instructed by McKernon & Rand, P.A. to institute collection" of $1,809.65 from each of the Lieutenants. Later, after several of the Lieutenants expressed a desire to submit the fee dispute to binding arbitration, Caravaggio sent a letter to them on March 4, 2009, referencing "McKernon & Rand, P.A. Fee Dispute," and providing information about how to initiate fee arbitration through the Montgomery County Bar Association. Caravaggio also wrote to the Bar Association's fee

dispute committee, stating that "McKernon & Rand, P.A. contends" that nine Lieutenants owed fees to that firm.

The dispute was then submitted to Bar Association's Committee on the Resolution of Fee Disputes and assigned to David Goldberg, Esquire (hereafter "Goldberg") for arbitration. Barbara Graham, Esquire was appointed by the Committee to represent the Lieutenants' interests in the arbitration. On November 2, 2009, Respondent personally sent Graham a letter asserting his claim that the Lieutenants "owe me from $27,000 to $63,000 (and have for almost two years) depending on how the Arbitrator decides the case." Respondent also asserted that he would be entitled to a one-third contingency fee following remand of the case to the MSPB on an award of back pay. Ultimately, however, the arbitrator ruled entirely in favor of the Lieutenants and against Rand in the fee arbitration.

Petitioner contends that Rand's pursuit of attorney's fees in the name of McKernon & Rand, P.A. after October 16, 2008 constituted professional misconduct prejudicial to the administration of justice (Rule 8.4(d)). The reasoning of the Petitioner is that Rand's collection efforts constituted the transaction of business prohibited by Section 3–514 cited above and, therefore, subjected him to criminal prosecution for a misdemeanor under that law. Was Rand *transacting business* by his efforts to collect fees after he knew of the forfeiture? It is unclear to the court that a person who makes efforts to collect attorney's fees or another debt "transacts business" in the context of Section 3–514, and the Petitioner has not provided legal authority or persuasive argument for its conclusion on that issue. Certainly, the active representation of clients would constitute the transaction of business, but Respondent had withdrawn from the case and was no longer working for or charging fees to the Lieutenants when he became aware of the corporate forfeiture. Particularly when one considers Section 3–515 of the Corporations and Associations Article, it seems that he was not transacting business, at least in the context of corporate forfeiture laws. Section 3–515 provides that the directors of

a forfeited corporation become trustees of the corporation and "shall" collect its assets (such as accounts receivable), pay its debts, and distribute its assets. While the fees sought to be collected were not legally collectable in a civil action since they were incurred when Rand worked unknowingly through the vehicle of a forfeited corporation, it appears that efforts to collect fees or other debts in the name of a forfeited corporation do not constitute the criminal transaction of business under Section 3–514.

However, assuming *arguendo,* that Rand's collection efforts did constitute the unlawful transaction of business, and did subject Rand to criminal prosecution for a misdemeanor under Section 3–514, the court will evaluate Petitioner's contention of professional misconduct. Petitioner's position in this regard is that "[w]hen an attorney violates the laws of this State and could be criminally prosecuted for such violation, he has committed conduct prejudicial to the administration of justice." [Petitioner's Proposed Findings of Fact and Conclusions of Law, p. 30]. In support of this broad proposition, Petitioner cites analogously ("cf") to *Attorney Grievance Commission v. Tayback,* 378 Md. 578 [837 A.2d 158] (2003). In *Tayback,* an attorney's failure timely to file tax returns or pay taxes for several years (and for which he was convicted criminally) was found to constitute misconduct prejudicial to the administration of justice, in violation of Rule of Professional Conduct 8.4(d).

In its entirety, Rule 8.4 provides [emphasis added]:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

**(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;**

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

**(d) engage in conduct that is prejudicial to the administration of justice;**

(e) knowingly manifest by words or conduct when acting in a professional capacity bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status when such action is prejudicial to the administration of justice, provided, however, that legitimate advocacy is not a violation of this paragraph;

(f) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Maryland Lawyers' Rules of Professional Conduct or other law; or

(g) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

In the context of the instant case, it is helpful to consider the following Comments to Rule 8.4:

■ Many kinds of illegal conduct reflect adversely on fitness to practice law, such as offenses involving fraud and the offense of willful failure to file an income tax return. However, some kinds of offense carry no such implication. Traditionally, the distinction was drawn in terms of offenses involving "moral turpitude." That concept can be construed to include offenses concerning some matters of personal morality, such as adultery and comparable offenses, that have no specific connection to fitness for the practice of law. Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, or breach of trust, or serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation.

*　*　*　*　*　*

■ A lawyer may refuse to comply with an obligation imposed by law upon a good faith belief that no valid obligation exists. The provisions of Rule 1.2(d) concerning a good faith challenge to the validity, scope, meaning or application of the law apply to challenges of legal regulation of the practice of law.

In asserting misconduct by Rand, Petitioner relies upon the criminality of conducting business while a corporation's charter is forfeited, but does not rely on the professional rule that expressly sets forth the sort of criminal conduct that also constitutes professional misconduct. The Rule provides that professional misconduct occurs if a lawyer commits a "criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects." The relevant Comment specifies certain criminal acts within the Rule's ambit and states generally that "a lawyer is personally answerable to the entire criminal law, [but] a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice." Despite this degree of specificity and guidance elsewhere in Rule 8.4, Petitioner relies in this case on the relatively amorphous prohibition against "conduct that is prejudicial to the administration of justice" under Rule 8.4(d) without explaining how Respondent's conduct prejudiced the administration of justice.

The *Tayback* case cited as support for Respondent's position involved repeated failures over years to file state and federal income tax returns, followed by criminal convictions for those offenses. Respondent's conduct, under Petitioner's position, exposed him to a misdemeanor and a $500 fine for trying unsuccessfully to collect attorney's fees. That conduct does not appear to the court to be the sort for which a lawyer is "professionally answerable." No authority has been presented to the court and it is not aware of any supporting Petitioner's broad proposition that "[w]hen an attorney violates the laws of this State [no matter what the violation may be] and could be criminally prosecuted for

such violation, he has committed conduct prejudicial to the administration of justice."

Petitioner has failed to present sufficient basis, argument or legal support for the court to find clearly and convincingly that Respondent's attempt to collect attorney's fees for a forfeited corporation constitutes a violation of Rule 8.4.

2. *Lunsford's Hiring of and Representation by Respondent*

Petitioner asserts as a Rule violation Respondent's failure to file a grievance for Charles Russell Lunsford or to file a motion to allow him to join the Lieutenants' case while it was pending. The background leading up to Respondent's representation of Lunsford is critical to an evaluation of this charge.

Lunsford was the Lieutenant who "signed up" on the June 11, 2005 Memorandum of Understanding (MOU), but who did not then follow through with retention of the Respondent. Lunsford identified the MOU at trial as the "draft copy" of the retainer agreement on which he printed his name. It appears from the evidence that Lunsford soon thereafter received a formal Retainer Agreement via an email from Rand's office dated June 14, 2005 (Petitioner's Exhibit No. 9). The email was sent to several addresses, including what appears to be Lunsford's address, "russ51@ comcast.net." While Lunsford had approved the one-third contingency fee set forth in the MOU, thus reflecting his intention then to retain Respondent, he testified that when he received the June 14th email and saw the actual "retainer agreement with contingency fees and all" he thought fees contained in that document were excessive. That is, Lunsford made an economic choice then not to join the Lieutenants' group or to retain Rand. Consistent with that decision, he did not sign the Retainer Agreement or send a retainer check to Rand's firm in or about June, 2005.

Of particular significance in Lunsford's receipt of the June 14th email are the contents of that communication stating: "As Mr. Rand stated last Saturday, the clock is

running, so we need to get everyone on board who is interested in filing a grievance (or participating in the filing of a mutual grievance)". (Petitioner's Exhibit No. 9, page 1, para. 3). In light of his decision not to retain Respondent, Lunsford knew Rand would not be filing a grievance about pay compression for him, and Lunsford chose further not to file one on his own behalf. The failure to file a timely grievance within the short 20 or 30 day time frame to do so prevented Lunsford from obtaining back pay or any relief not generally provided to lieutenants across the board regardless of their participation or not in the Lieutenants' group. At trial, Petitioner's counsel asked Lunsford if he had knowledge of the deadline to file a grievance. He responded that "as a county employee I knew that there were deadlines for grievances but at that time, I had no reason to consider those because I hadn't filed a grievance." Lunsford, as of 2005, had been a county employee for 27 years.

Over the course of the next 11 months after June 2005, Lunsford was encouraged by the Lieutenants to join their group, and he finally decided to do so in May of 2006. He made this decision because he was "coming up to retirement and it would enhance my retirement" to have an increase in pay rate going into the future. (It is important to note that the County decided to make the voluntary pay increase almost one year later, in 2007). Lunsford then called Respondent about joining the Lieutenants' group and made arrangements to come to Respondent's office to pay the $500 retainer fee plus $400 expert witness contribution. Lunsford did not testify about any substance of that phone conversation beyond his telling Respondent that he wanted to "join" the case and being advised of the fee retainer and expense contribution (both totaling $900). When Lunsford went to Rand's office to make the payment ($500.00 in cash and a separate amount of $400.00 via credit card), he recalls then having only a "cordial" non-substantive conversation with Respondent. According to Lunsford, Respondent did not tell him what action he would take on his behalf,

although Lunsford "think[s]" something was said about amending "my name to the case." Respondent has no specific recollection of these communications with Lunsford. Therefore, based on Lunsford's somewhat hazy testimony, it appears he was not told that it was then too late to join the case as a party, that he was precluded from filing a grievance at that point in time, and that the failure of a timely grievance filing prevented an award of back pay.

As with the original 11 members of the Lieutenants' group, Respondent "operated on" the MOU as the *de facto* retainer agreement with Lunsford. Lunsford acknowledged in his testimony that he believed he had seen the first page of the June 11, 2005 MOU in June 2005, although he testified he did not receive a copy of it (his name is printed on page two of the MOU).

Lunsford testified that he subsequently made additional fee payments in cash, possibly through Ezunagu, but he is unsure whether they were for Respondent or the successor attorney, Mr. Slade. Lunsford received no billing statements or accounting from Rand "other than from the executive committee," yet Ezunagu and Wade (the members of the Executive Committee) deny receiving such documents from Rand.

Central to its claims against Respondent, Petitioner asserts that after Rand was retained by Lunsford, Rand did not attempt to file a belated grievance on his behalf with OHR and did not file any motion, amended appeal or other document requesting that Lunsford be permitted to join the class of grievants in the Carroll case before MSPB.

On July 19, 2006, Respondent generated a Memorandum directed to "Payroll Department, Montgomery County." The memorandum listed the names of 12 Lieutenants, including Lunsford, from whom it purported to be sent. The memorandum included the following sentence: "I hereby instruct and direct that one-third (1/3) of any retroactive award for back pay be made directly to my attorneys, McKernon & Rand, P.A., with the balance sent to myself." The document then included signature lines for 12 Lieuten-

ants, including Lunsford, each of whom apparently signed
the memo. Lunsford acknowledged that he signed the July
19, 2006 memo and understood that this was part of the case
Rand was pursuing on behalf of him and the other 11
Lieutenants.

When the Final Decision came from the MSPB following
the appeal, Lunsford was not included in the back pay
award because he had failed to exhaust his administrative
remedies since no grievance had been filed timely by him or
on his behalf. As with all the lieutenants, however, Luns-
ford did benefit from the front pay portion of the case.

Petitioner asserts that Respondent's continued represen-
tation of Lunsford in the Carroll case without (a) attempting
to remediate Lunsford's failure to file a timely grievance, or
(b) terminating his representation of Lunsford and refund-
ing all fees paid by Lunsford constitutes professional mis-
conduct.

Petitioner has not proven by clear and convincing evi-
dence that Respondent acted improperly in failing to at-
tempt remediation of the non-filing of the grievance. First,
the grievance deadline is an absolute—substantively identi-
cal to a statute of limitations. There is *no* procedure or
even discretionary relief available for a late filing. That is,
an attempt to "remediate" had no prospect for success. It
cannot be an ethical violation to fail to take action that
would have been futile. Furthermore, it is clear to the
court that Lunsford knowingly failed to file a timely griev-
ance on his own behalf and was well aware that he was
thereafter precluded from filing one.

The issue of Respondent's acceptance of attorney's fees
and expense contribution from Lunsford presents a more
difficult question. Respondent accepted payment from
Lunsford when he knew or should have known that Luns-
ford could no longer become a party to the case, could not
overcome the failure to file a timely grievance and, there-
fore, could not receive an award of back pay. On the other
hand, Lunsford's payment to Respondent supported finan-
cially "the cause" of the Lieutenants' group and diminished

somewhat the litigation cost of each Lieutenant who was a party to the case. Also, significantly, Lunsford was motivated to retain Rand to promote his interest in raising his personal pension benefits by obtaining an increase in his future rate of pay for which he was still eligible despite his grievance status. However, Lunsford was in a position when he paid Rand that he would have benefitted from any future pay increase *without* making the payment because Lunsford was in the class of lieutenants affected by the pay compression problem without becoming a party to the case he could no longer join. Under these circumstances, Lunsford may well have wanted to support "the cause" of all the lieutenants by paying Rand even without becoming a party or being eligible for back pay. The problem here is that the record does not show that Lunsford was placed in a position by Rand to make an informed decision on that matter. Rand should have expressly (and preferably with documentation) advised Lunsford of his ineligibility to become a party or to obtain back pay before accepting him as a client. There is no indication from the testimony or any documentary exhibits that Rand did so.

In his communications with Lunsford, Respondent failed to provide him with information reasonably necessary to permit Lunsford to make an informed decision regarding representation. He thereby violated Rule 1.4 (Communication). With proper information, Lunsford probably would have decided to engage Respondent to represent his interest as it was shared with the other lieutenants even without being a party to the suit, but Rand's failure prevented Lunsford from making such a decision from an informed position. After Lunsford paid the Respondent, however, he diligently and competently pursued the Lieutenant's case, kept Lunsford and the other Lieutenants reasonably informed, and put forth efforts that enabled the case to end favorably for all the lieutenants. The court concludes, under all the circumstances, therefore, that Respondent with respect to Lunsford did not violate Rule 1.1 (Competent Representation), Rule 1.3 (Diligence) or Rule 8.4(d)

(Professional Misconduct prejudicial to the administration of justice). In addition, given Lunsford's promotion of his own self-interest in "hiring" Respondent, the fact that Lunsford's payment contributed to the cause of Lunsford and all the lieutenants, the fact that Rand's work was in Lunsford's interest, and the favorable outcome of the case on the front pay issue, the court cannot conclude by clear and convincing evidence that Rand violated Rule 1.5(a) (Fees).

The court does not find any violation based on Rand's alleged failure to explain the distinction between the Carroll case and the Grievance II matter for the same reasons set forth below in the discussion about Grievance II.

Accordingly, with respect to Lunsford, the court finds by clear and convincing evidence that Respondent violated only Rule 1.4 (Communication) and not the other Rules cited by Petitioner.

3. *Respondent's Communication with Lieutenants regard-ing Case Status and Billing*

This section addresses Petitioner's allegations that Respondent failed to keep the Lieutenants reasonably informed and failed to be responsive to the Lieutenants' inquiries about the status of their case and billing by Respondent, particularly when the case was pending in the Circuit Court.

As noted much earlier in this Statement, an executive committee of the Lieutenants was created to foster communications and decisions with Rand. The committee initially consisted of Ike Ezunagu, Bernard Wade and Bernard Chisley, although the responsibilities of the executive committee were never formalized in writing. Wade testified that the committee communicated with the larger group but did "not collect money or copy documents for others." Wade testified further that he did not receive or ever see until the fee dispute arbitration numerous communications identified at trial as originating from Respondent's office and containing Wade's address. These include several Petitioner's Exhibits: No. 9 (June 14, 2005 email with Retainer

Agreement attached) even though an email address of "abwade@cs.com" appears on the email; No. 8 (Retainer Agreement attached to June 14 email); No. 7, page 1 (the MOU on which Wade's name is printed on P. 2); No. 11 (December 12, 2005 letter from Respondent addressed to Wade's, Chisley's and Ezunagu's residences); No. 12 (March 7, 2006 letter from Respondent addressed to Wade's, Chisley's and Ezunagu's residences); No. 13 (memorandum on Respondent's letterhead, addressed to Montgomery County Payroll Department and *signed* on page 2 by Wade); No. 14 (Memorandum to Wade from Human Resources regarding pay adjustment); No. 15 (numerous bills from Respondent addressed to Ezunagu); No. 16 (Rand letter of July 10, 2007 addressed to Wade's and others' residences).

Similarly, Ezunagu testified that he did not receive from Respondent's office several documents that were addressed to him. These include, but are not limited to, Petitioner's Exhibits: No. 12 (March 7, 2006 letter from Respondent addressed to Wade's, Chisley's and Ezunagu's residences); No. 15 (numerous bills from respondent addressed to Ezunagu); No. 16 (Rand letter of July 10, 2007 addressed to Ezunagu's and others' residences).

It is difficult for the court to believe that these communications were not sent to Wade and Ezunagu, particularly since many were generated before the substantial deterioration of the attorney/client relationship. The court is in a quandary as to how and why they would not have been received. At a minimum, these exhibits tend to dispute contentions regarding insufficient communication by Respondent. Wade's and Ezunagu's testimony regarding them raises serious questions about their recollection of events and their maintenance of documentation throughout their case, which had its beginnings in 2005 and covered several years (not to mention that their testimony at this trial took place several years after the events and documents at issue). However, this "murkiness" in the testimony is of limited probative value to the claims of inadequate

communication because the alleged communication failures relate to the Lieutenants' inquiries about the status of their case and the billing by Respondent during a short period of the representation.

The period Petitioner alleges Respondent violated his duty of reasonable communication was when the administrative appeal was pending in the Circuit Court, and, in particular, in the Fall of 2007. The evidence at trial really only reflected communication issues between Respondent and the Lieutenant executive committee in the relatively narrow time span of September, October and November of 2007. Significantly, however, this short period reflected much more of a *dispute* between Respondent and Wade rather than a lack of communication. While there were gaps in communication that could have been shorter and Respondent could have responded more quickly, these were not substantial and, in fact, caused no harm to the Lieutenants or their case.

As stated in the Findings of Fact above, the evidence regarding the Fall 2007 communications issues was as follows:

Wade testified he telephoned and faxed documents to Rand in September, 2007 (citing no specific dates in September), emailed him on October 4, 2007 (Petitioner's Exhibit No. 18), and sent an email (Petitioner's Exhibit No. 20) and identical certified letter to him on October 16, 2007 (Petitioner's Exhibit No. 19). In these communications, Wade expressed disagreement with Rand's strategies, irritation that Respondent met with the County Attorney without any Lieutenants present, and anger that he failed to schedule a meeting with the County Executive to try to resolve the dispute from a political approach. Wade testified that Respondent ignored his communications until responding with a letter to Wade and Ezunagu dated October 22, 2007 (Petitioner's Exhibit No. 21), which addressed Wade's issues, as well as pressed the fee demand. The Rand letter also proposed a meeting with Wade and Ezunagu to discuss the issues raised by Wade

and to set a "common goal." Wade testified he did not receive this communication even though the memorandum was addressed to him. However, Wade did acknowledge that "around this time frame" he and Respondent were in contact with each other.

On November 13, 2007, Respondent sent a letter (Petitioner's Exhibit No. 21) to the entire Lieutenant group at their residences (another communication Wade denies receiving) requesting payment of a fee as adjusted in consultation with the Executive Committee at a meeting he held with them a few days before. His letter also explained his assessment of the status of the case, opined that the County's voluntary salary adjustment was substantial, etc. His letter stated that a "detailed billing history of my work for you is available to you upon request." Wade testified he asked for billing documentation, but was denied such for months. It is unclear from Wade's testimony when this request was made and how and when Rand responded. Wade contended Rand was owed no additional fees.

During the time alleged, there clearly was a dispute between Respondent and his clients, but the court fails to see this set of facts as constituting a failure of communication amounting professional misconduct.

With respect to a lawyer's financial responsibilities to a client, Rule 1.15 provides, in pertinent part:

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

Administrative assistants of Respondent over the years relevant to this disciplinary matter all testified credibly that they routinely prepared bills for Respondent's clients, in-

cluding those in the Lieutenants' case. They sent out those bills on a regular (generally monthly) basis and did not recall having any Lieutenants' group bills being returned in the mail. None of the staff members received any complaints from anyone in the Lieutenants' group regarding billing communication problems or unreturned phone calls by Respondent.

Due to strictures of the firm's billing software and because of the executive committee framework, Lt. Ezunagu was the primary client for billing purposes and all billed time was entered on a client ledger bearing Ezunagu's name. Although a separate ledger was set up for receipt of each Lieutenant's initial $500.00 retainer, subsequent fee payments from the Lieutenants, including Lunsford's payments, were recorded on the collective Ezunagu ledger. Billing statements were generated and mailed on a monthly basis, although both Ezunagu and Wade testified that they did not receive any monthly billing statements from Respondent.

Petitioner has not proven by clear and convincing evidence a violation of Rule 1.4.

### 4. Reasonableness of Fees

One expert for each side testified at trial about the fees charged by Respondent to the Lieutenants. Petitioner presented David Goldberg, Esquire. Prior to trial, he was the arbitrator in the fee dispute and determined that Respondent was not entitled to any additional fees beyond what had been paid by the Lieutenants prior to the arbitration. Goldberg has practiced law for more than 40 years, but does not have experience in cases involving county employment disputes and the Merit System process. On the other hand, Respondent presented expert testimony from John McCabe, Jr., Esquire (hereafter "McCabe") that Respondent's fees were reasonable.

Neither expert was particularly helpful to the court on the issue of fees. McCabe is a long-time, close friend of Respondent and lacks experience in county employment law

and procedure. In addition to Goldberg's similar lack of experience in the county employment area, his persuasiveness and credibility was undermined (if not obliterated) by his demeanor on the witness stand. The vigor and even anger with which Goldberg testified was stunning. He came across to the court as an advocate rather than an objective expert rationally analyzing the facts. Under fair and reasonable cross examination, Goldberg became angry, accused Respondent of fraud and opined unreasonably that the outcome of the Lieutenant's case was "disastrous." His vociferousness on the witness stand was not justified by the facts and circumstances of this case. Furthermore, Goldberg did not base his opinions on the several factors under Rule 1.5 for the determination of the reasonableness of attorney's fees.

Without a persuasive expert for either party, the court must assess the reasonableness of fees almost on its own. It concludes by a standard of clear and convincing evidence that Respondent's fees were not unreasonable.

In criticizing Respondent's fees, Petitioner focuses largely on his work with William Nullmeyer (hereafter "Nullmeyer"), one of two expert witnesses he secured for the case. Nullmeyer is a retired OHR employee whose job responsibilities with Montgomery County had included conducting studies of occupational classes in the public safety field, particularly regarding appropriate salary ranges for position classifications. Nullmeyer agreed to work for the Lieutenants without compensation and spent extensive time meeting with Respondent in order to educate him regarding Montgomery County personnel regulations and the technical terminology and information necessary to handle the case. Nullmeyer's assistance to Respondent included significant editing of correspondence and of documents drafted by Respondent for submission to MSPB.

Through Goldberg, Petitioner contends Respondent billed the Lieutenants an excessive number of hours for time spent conferring with Nullmeyer. Petitioner asserts, in essence, that Respondent was "charging the clients for time

that Nullmeyer spent educating Respondent on how to handle the case as part of their 'hand in glove' relationship." While Respondent and Nullmeyer spent some 70 hours together, there is a lack of evidence beyond that mere number that the time Rand spent with Nullmeyer was unreasonable. Experts are used in litigation regularly to "teach" lawyers and to strategize cases. The court has before it no *qualitative* evidence indicating that the time spent with Nullmeyer did not properly serve the goals of Respondent's clients. The court, in essence, is asked to conclude merely on the *quantity* of hours and in hindsight that the client's goals were not thereby served. The evidence fails to show by the clear and convincing standard that Respondent's fees relating to the Nullmeyer consultations were unreasonable.

Goldberg also offered the opinion that it was inherently unreasonable for Respondent to continue asserting a claim for a one-third contingency fee against any award of retroactive back pay while also charging an hourly fee. No support was offered for that conclusion. Although Rand charged both an hourly fee and a contingency fee, his hourly rate was reduced from his regular $275 to $175 per hour in consideration of the contingency fee component. Also, the contingency applied solely to one component of possible damages—back pay—which was considered unlikely to be obtained at the time the fee structure was arranged. The award of future pay was more likely to be successful and was the more important goal for the Lieutenants as it would impact their pay for the rest of their careers, as well as their retirement income benefits. Considering these circumstances, it was not unreasonable to have a two-tiered fee arrangement geared to the two separate potential types of recovery.

Petitioner contends further that it was unreasonable for Respondent to continue to assert a contingent fee claim after he voluntarily withdrew from representing the Lieutenants prior to the successful outcome and before the occurrence of the contingency (i.e., an award of retroactive

back pay, upon which the contingent fee would be based). This contention misses the point that Respondent withdrew from the case in large part, at least, over a fee dispute. It was not objectively unreasonable to seek (although not necessarily successfully) a contingency fee for the outcome obtained on the theory that the clients forced the withdrawal and the contingency event ultimately occurred. Respondent made the record below the Court of Special Appeals on which relief was ultimately obtained. The court is not stating that Respondent should have been successful in this approach, but it was not unreasonable to "make the argument" that he was entitled to a contingency fee. Further, Respondent sought as an alternative a *quantum meruit* recovery, which is a viable form of relief where a contingency fee is not appropriate.

Petitioner has failed to prove by clear and convincing evidence a violation of Rule 1.5 (Fees).

### 5.  Individual Accounting

Respondent is alleged to have violated Rule 1.15. In pertinent part, the Rule provides as follows:

> (d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

Respondent and the Lieutenants agreed to communicate through an executive committee as discussed above. Furthermore, a course of conduct was followed consistent with this agreement. The establishment of an executive committee was a sensible and economical approach to the representation of a group of clients. Although members of the executive committee now deny receipt of bills and other communications (some more than five years ago), it appears

from the evidence that Respondent regularly rendered billing statements and accounted to the executive committee when requested. Respondent did not have a duty to reach out to other members of the Lieutenants' group without a specific request for an accounting. As discussed above, he did account properly to the executive committee.

The court also finds that Petitioner failed to prove by clear and convincing evidence its claims that Respondent's client ledgers "did not offer a transparent and easily comprehensible accounting of Respondent's legal services" that would justify the fees billed. Respondent's internal ledgers were not unreasonably complicated and Respondent met with the executive committee to explain them. Much of Petitioner's criticism relies upon the alleged lack of clarity in Respondent's internal accounting system. The internal system underlying the bills issued to the clients was commonly used by attorneys.

Petitioner has failed to prove by clear and convincing evidence that Respondent violated Rule 1.15.

### 6. The "Grievance II" Retainer Agreement

As discussed previously, "Grievance II" consisted of a single consolidated filing by Respondent that went no further than the filing itself. The matter was in substance a strategic point of attack for the Lieutenants in their pay compression claims to place additional pressure on the County to resolve the Lieutenants' employment claims. However, Grievance II had a lifespan of only a few weeks before it was stayed by agreement with the County Attorney. Assistant County Attorney Bernadette Lamson, who handled the Carroll case for the county, testified that the Carroll case and Grievance II involved the same issues. She also noted that the Grievance II case was never revived because its issues were resolved within the Carroll matter.

There is no allegation that Respondent acted wrongfully in allowing the Grievance II matter to be held "in abeyance" while the Carroll case proceeded. Rather, Petitioner asserts that Grievance II (despite Attorney Lamson's correla-

tion of the Carroll issues with it) was wholly independent from the representation provided by Respondent in the Carroll matter and contends that Respondent engaged in misconduct by failing to obtain separate authorization to pursue it.

The Memorandum of Understanding (MOU) discussed well above herein, which Rand and the Lieutenants treated as their operable retainer agreement, set forth a broad scope of Rand's representation—i.e. "representation in connection with issues related to pay compression and/or disparate treatment of employees and/or disproportional pay compared to duties" and "other issues like shift assignments." This was clearly broad enough to include the Grievance II matter within the scope of Rand's authorized representation. Although Grievance II was administratively created by Respondent's firm as a separate matter, it was so related in substance to the original pay compression claim that a separate retainer communication was not necessary. Consequently, Petitioner has failed to prove that Grievance II constituted an independent representation separate from the original grievance in the Carroll matter or that it was outside the scope of the MOU. Accordingly, it was not improper for the Respondent not to obtain formal authorization to initiate Grievance II as to Lunsford or the other Lieutenants.

Even if Grievance II were viewed as an independent matter, it was initiated on behalf of Respondent's existing clients and Respondent, therefore, had pursuant to Rule 1.15(b) a "reasonable time after commencing" the action to communicate with the Lieutenants about it. Since Grievance II was halted just after it was filed, it was not a violation for Respondent to fail to communicate with his clients about the scope of representation and fee.

The Petitioner has failed to prove by clear and convincing evidence its charge of a violation of Rule 1.5(b) (Fees, Communication) in connection with the Grievance II matter.

*A Concluding Observation*

The court feels it appropriate to make some observations about this professional misconduct case. It has been a complex case with many nuanced interpretations of conduct as allegedly constituting misconduct. There are so many contentions of misconduct that the court has wondered to itself negatively to the Respondent if there is not more "fire where there is so much smoke" or, on the other hand negatively to the Petitioner, if so much has been "thrown against the wall to see if any of it sticks." It was not helpful that much documentation was entered into evidence without objection and without guidance to the court about why it was thought to be probative. There are cartons of documentary evidence that the court had to make its way through on its own, following a four-day trial. Many witnesses had dim memories of events and denied receiving numerous documents that certainly appear to have been sent to them. Both expert witnesses appeared to have personal "agendas."

Furthermore, the animosity and contentiousness between the Lieutenant witnesses and the Respondent were palpable at trial. This ill will arose during and infected the underlying pay compression case while Respondent was still handling it (as reflected by disagreement in strategies, distrust of each other, and anger through the arbitrated fee dispute). The court has tried to reach through these obstacles to make factual findings and apply the law as it best sees fit. It has been a difficult process and has contributed substantially to the delay regretted by the court in issuing this Statement.

### *SUMMARY*

Petitioner has proven by clear and convincing evidence that Respondent violated Rule 1.4 (Communication) in his dealings with Lt. Lunsford and has failed otherwise to prove by clear and convincing evidence that Respondent violated Rules 1.1, 1.3, 1.4(a), 1.5(a), 1.5(b), 1.15(d), 8.4(a) or 8.4(d).

### *Mitigation Findings*

Respondent's violation of Rule 1.4 (Communication) with respect to Lunsford was not in bad faith (in fact, it was more "sloppy" than a significant malfeasance). With proper communication there is a reasonable likelihood that Lunsford would still have paid toward the litigation fees and expenses. Because Lunsford was a relatively sophisticated client with particular knowledge and experience as a very long-term county employee in grievance matters, Respondent was likely less on guard to his duty to discuss Lunsford's status in relation to the other Lieutenants. Respondent's work in the case helped bring about a good outcome for Lunsford and all the Lieutenants.

"This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland." *Attorney Grievance v. Stern,* 419 Md. 525, 556, 19 A.3d 904, 925 (2011), quoting *Attorney Grievance v. Nwadike,* 416 Md. 180, 192, 6 A.3d 287, 294 (2010). "We accept the hearing judge's findings of fact as prima facie correct unless shown to be clearly erroneous." *Id.,* citing *Attorney Grievance v. Palmer,* 417 Md. 185, 205, 9 A.3d 37, 49 (2010). We review the Circuit Court Judge's conclusions of law de novo, pursuant to Rule 16–759(b)(1).[9]

In this case, Bar Counsel takes exception to both Judge Jordan's findings of fact and his conclusions of law, but Rand excepts only to Judge Jordan's conclusion that he violated Rule 1.4.[10]

Bar Counsel's first exception is to Judge Jordan's finding that, "Clearly, Respondent's pursuit of the case for the Lieutenants' group provided critical impetus for the County's

---

**9.** Rule 16–759(b)(1) states:
  (b) **Review by Court of Appeals.** (1) Conclusions of law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

**10.** Bar Counsel also took exception to factual findings that Judge Jordan made in mitigation of Rand's conduct. Because the Petition for Remedial or Disciplinary action will be dismissed, however, we shall not address these exceptions.

decision to make the pay adjustment." Bar Counsel argues that Ms. Lamson, the Associate County Attorney, testified that there were multiple factors, not only Rand's suit, that led the County to provide prospective pay increases for all lieutenants. Bar Counsel focuses on the fact that Ms. Lamson testified that the reason that the County provided relief to the entire group was to provide equality across the board; he asserts that this statement is an indication that the primary motivation was not Rand's suit, but was the County's interest in fairness.

The record, however, supports Judge Jordan's finding that there was clear and convincing evidence that Rand's suit provided the "critical impetus" for the pay adjustment. Ms. Lamson testified that she was originally instructed to fight the lawsuit as strongly as she could, but, after approaching her superiors and informing them that there was a high likelihood that the County could lose and be faced with an unfunded liability, the County decided to provide the requested relief. Moreover, the County did *not* make the pay increase until after the case had been heard at both the administrative and circuit court levels, so that Rand's suit could have been viewed as the "critical impetus."

Bar Counsel next excepts to Judge Jordan's conclusion that Rand did not violate Rule 8.4(d), which prohibits conduct prejudicial to the administration of justice, with respect to Rand's attempts to collect fees on behalf of McKernon & Rand, P.A. Bar Counsel argues that once the charter of McKernon & Rand, P.A. was forfeited for a failure to file an income tax return for 2003, the association was a "legal non-entity" that could neither sue nor be sued under Section 3–514 of the Corporations and Associations Article, Maryland Code (1975, 2007 Repl.Vol.), relying on *Dual, Incorporated v. Lockheed Martin Corp.*, 383 Md. 151, 857 A.2d 1095 (2004). As Judge Jordan found, Rand had actual knowledge at the time that he began the collection action at issue that McKernon & Rand, P.A. was no longer a valid corporate entity, and therefore, Bar Counsel argues, Rand knowingly violated Section 3–

514 of the Corporations and Associations Article of the Maryland Code, in violation of Rule 8.4(d).

■ To resolve Bar Counsel's exception, we must first determine whether Rand's actions did constitute a violation of Section 3–514. In so doing, we turn to *Dual, Incorporated v. Lockheed Martin Corp.*, 383 Md. 151, 163–64, 857 A.2d 1095, 1101–02 (2004), in which we reiterated that when a corporation becomes defunct, only transactions involving its winding up can be carried out. *Patten v. Board of Liquor License Commissioners*, 107 Md.App. 224, 667 A.2d 940 (1995), a case upon which we relied in reaching our conclusion in *Dual*, explained that the "winding up" duties "are administrative in nature, in that they are related to completing existing corporate business." *Id.* at 234, 667 A.2d at 945. In *Dual*, we held that J. Frederick Dual was not "winding up" the affairs of Dual, Incorporated under Section 3–514, because he had been actively negotiating new contracts on its behalf, the corporation continued to perform existing contracts while defunct, and Mr. Dual and had not made any effort to "dispose of existing assets, debts, or obligations" of the corporation. *Dual*, 383 Md. at 165, 857 A.2d at 1103.

Rand, however, was attempting to collect fees that he believed were owed to the law firm as a result of his legal work. It is a given that eviscerating debts owed and liabilities outstanding is inextricably linked to "winding up" a corporation, such that Rand's actions were related to the administration of the law firm, and, as a result, we overrule Bar Counsel's exception.

Bar Counsel next excepts to Judge Jordan's conclusion that Rand did not violate Rule 1.1 in his representation of Lieutenant Lunsford. Bar Counsel argues that Rand's "failure to provide Lieutenant Lunsford with information reasonably necessary to permit Lieutenant Lunsford to make an informed decision regarding representation was a violation only Rule 1.4," as well as Rule 1.1. In this regard, Judge Jordan had found that Mr. Rand erred in his communication, rather than in failing to exercise his knowledge or skill, but Bar Counsel

asserts that Rand's conduct "was due to a lack of competency, and not as a result of sloppiness, as the hearing judge suggested." Bar Counsel did not specifically except to Judge Jordan's finding regarding miscommunication, only to the failure to find a violation of Rule 1.1, and points to no evidence, other than the miscommunication itself, to support his argument that Judge Jordan's finding was erroneous. Judge Jordan's finding undercuts Bar Counsel's exception, and, thus, we overrule.

Bar Counsel next excepts to Judge Jordan's conclusion that Rand did not violate Rule 1.5(a), relating to fees. Bar Counsel argues that, because Lieutenant Lunsford was not a party to the grievance, nor could have become so at the time he engaged Rand, there was no possibility that Lieutenant Lunsford could obtain any relief and so *any* fee Rand accepted was unreasonable. This exception is problematic for a number of reasons. As Judge Jordan found, Lieutenant Lunsford could have joined his colleagues for solidarity purposes, a goal outside of remuneration. Most importantly, however, Judge Jordan found that Rand's suit provided the critical impetus for the across-the-board pay increase for the lieutenants so the fees paid by Lieutenant Lunsford were directly attributable to relief he received; as a result, we overrule Bar Counsel's exception to the conclusion that Rand did not violate Rule 1.5.[11]

Finally, Bar Counsel excepts to Judge Jordan's conclusion that Rand did not violate Rule 8.4(d) with respect to his representation of Lieutenant Lunsford, because, he argues, Rand intentionally sought to mislead Lieutenant Lunsford about his ability to seek financial relief. Bar Counsel asserts that Rand was deceitful because he continued to include Lieutenant Lunsford on the communications sent to the group

---

11. Bar Counsel refers to *Attorney Grievance v. Guida*, 391 Md. 33, 891 A.2d 1085 (2006), to support his argument that Rand violated Rule 1.5. *Guida*, however, dealt with an attorney who collected a fee, provided no services in furtherance of his clients' goals, and lied about his actions "in a misguided effort at concealment of his nonfeasance," *id.* at 53, 891 A.2d at 1096, all of which are inapposite.

of lieutenants. Judge Jordan found, however, that Rand was sloppy and not intentionally misleading. Mere mistake does not rise to the level of intentionality required for an 8.4 violation and, therefore, we overrule Bar Counsel's exception.

■ The most difficult issue that is raised in the present case is presented by Rand's exception to Judge Jordan's conclusion that Rand violated Rule 1.4 by "fail[ing] to provide [Lieutenant Lunsford] with information reasonably necessary to permit Lunsford to make an informed decision" and that "Rand should have expressly (and preferably with documentation) advised Lunsford of his ineligibility to become a party or to obtain back pay before accepting him as a client." Rand argues that Judge Jordan erred in his conclusions of law because of Judge Jordan's finding that earlier Rand had told Lieutenant Lunsford and the other lieutenants of the need to quickly file a grievance or risk losing that right.

■ Rule 1.4 requires that an attorney "explains the matter to the extent reasonably necessary to allow the client to make informed decisions about the course of the representation." *Attorney Grievance v. Walker–Turner,* 428 Md. 214, 231, 51 A.3d 553, 563 (2012). Rand's exception implicates the application of Rule 1.4 to the process of counseling a client.

To our knowledge, this is our first foray into the role of a lawyer as counselor. We have previously found violations of Rule 1.4 in situations in which an attorney has wholly failed to respond to client requests for information, *Attorney Grievance v. Garrett,* 427 Md. 209, 46 A.3d 1169 (2012), in situations in which an attorney has failed to communicate at all with his clients after undertaking representation, *Attorney Grievance v. Nelson,* 425 Md. 344, 40 A.3d 1039 (2012), and in situations in which an attorney has misled his clients about work that he had done, *Attorney Grievance v. Webster,* 402 Md. 448, 937 A.2d 161 (2007). In this regard, however, Judge Jordan concluded that Rand had violated Rule 1.4 because of Rand's alleged failure to inform Lieutenant Lunsford about a course of action Rand could not pursue for Lieutenant Lunsford, that

being adding Lieutenant Lunsford to the grievance and receiving remuneration, even though that could not happen.

■ In so concluding, however, the hearing judge erred in not viewing counseling Lieutenant Lunsford as a process, which occurred over a period of time. Counseling is the "process by which [one] facilitate[s] the achievement of [client] goals and the resolution of [client] problems...." David A. Binder et al., *Lawyers as Counselors: A Client–Centered Approach* 3 (3d ed.2012). "Process" is the variable here, given that the relationship between Rand and Lieutenant Lunsford spanned nearly three years. As such, our analysis must take into account the entire interaction between Rand and Lieutenant Lunsford and the information that was communicated durationally.

Judge Jordan found that Rand had informed Lieutenant Lunsford initially, along with his colleagues, of the need to file a grievance quickly, because "the clock is running." [12] The Judge also found that Rand also sent Lieutenant Lunsford an email informing him of the need to move quickly:

> Of particular significance is Lunsford's receipt of the June 14th email are the contents of that communication stating: "As Mr. Rand stated last Saturday, the clock is running, so we need to get everyone on board who is interested in filing a grievance (or participating in the filing of a grievance)."

---

**12.** The dissent characterizes our conclusion that Rand explained the effect of failing to file a grievance, at the initial meeting, as "wrong patently." The dissent argues that Rand's informing the lieutenants that "the clock is running" was not sufficient to inform Lieutenant Lunsford of the consequences of not filing a grievance, because it was too vague to convey the full effect of inaction on Lieutenant Lunsford's part. This argument, however, is at odds with Judge Jordan's finding, to which no exception was taken, that, "it is clear to the court that Lieutenant Lunsford knowingly failed to file a timely grievance on his own behalf and was well aware that he was thereafter precluded from filing one." While the email sent by Rand may not have included information on the "specific regulatory limitations period on filing grievances," as is noted by the dissent, Judge Jordan's finding undercuts the notion that Rand did not explain fully to Lieutenant Lunsford the consequences of not filing a grievance and the need for a timely response.

Lieutenant Lunsford thereafter decided not to join with the rest of the group in filing a grievance, because he felt that Rand's fees were too high. Although Judge Jordan found that Rand did not reiterate to Lieutenant Lunsford the consequence of having failed to join the grievance, his earlier advice undercuts the notion that Rand violated Rule 1.4.

It is clear that Rand explained the consequences of failure to file a grievance at the time of the initial meeting. To parse out what an attorney counsels or fails to counsel, as to the consequences of a client's failure to act, at each meeting, without consideration of what had been counseled at earlier meetings, is to tread a dangerous path when addressing willful violations.

As a result, there is not clear and convincing evidence that Rand violated Rule 1.4. While Rand certainly could have, and possibly, discretion being the better part of valor, should have, reiterated to Lieutenant Lunsford that he could not have been a party to the actual grievance, his failure to reiterate, when he already had informed Lieutenant Lunsford of the consequences of his failure to act timely, does not constitute a violation of Rule 1.4; as a result, without any violations of the Rules being sustained, the Petition for Remedial or Disciplinary Action is dismissed.

**IT IS SO ORDERED.**

HARRELL, J., concurs and dissents.

HARRELL, J., concurring and dissenting.

I concur in part and dissent in part. Although I agree with the Majority opinion's disposition of most of Bar Counsel's exceptions, I would sustain Bar Counsel's exceptions to the hearing judge's determinations that Rand did not violate Maryland Lawyers' Rules of Professional Conduct ("MLRPC") 1.1 and 1.5(a). Moreover, unlike the Majority opinion, I would overrule Respondent's exceptions and sustain the hearing judge's relevant findings of fact and conclusion of law that Rand violated MLRPC 1.4. Accordingly, I would suspend Rand for 30 days.

## MLRPC 1.1 and 1.4

As to the "front pay" claim aspect of the Lieutenants' grievance, Rand did not represent competently Lunsford when he failed to advise Lunsford (at or about the time he accepted Lunsford's retainer payment) that Lunsford could not be added to the pending grievance, which became the only vehicle through which Lunsford could have been eligible for such relief. Rand's pre-retention "advice" that the "clock is running" is too vague to alert a lay person (even a long-time county employee such as Lunsford) about the applicable and specific regulatory limitations period on filing grievances, which had expired at the time Rand accepted Lunsford's retainer payment. As the hearing judge noted, "[Lunsford, at the time he engaged Rand in May 2006] was not told that it was too late to join the case as a party, that he was precluded from filing a grievance at that point in time, and that the failure of a timely grievance filing prevented an award of back pay."

The hearing judge evaded this "difficult question," however, by making the unwarranted supposition (bereft of evidentiary support or reasonable inference from any testimonial or other evidentiary foundation) that "Lunsford may well have wanted to support 'the cause' of all the lieutenants ... even without becoming a party or being eligible for back pay." Even with that unsupported supposition, the hearing judge concluded nonetheless that Rand's failure to give Lunsford an informed basis in May 2006 from which to decide whether to pay the retainer to engage Rand violated MLRPC 1.4 (Communication). I conclude that this failure to communicate[1] material information also betrayed a lack of competence on the part of Rand.

The Majority opinion expresses the view that "[i]t is clear that Rand explained the consequences of failure to file a

---

1. With fond memories of the similar memorable phrase ("What we got here is [a] failure to communicate.") from the mouth of Strother Martin's character, the Captain, in the movie COOL HAND LUKE (Warner Brothers/Seven Arts 1967).

grievance at the time of the initial meeting." Op. at 718, 57 A.3d at 1002 (2012). That is wrong patently. Rand did not, and there is no evidence to support that conclusion. As I mentioned earlier, saying that "the clock is running" is not an acceptable substitute for a lawyer's clear statement regarding the existence or operation of a· finite regulatory limitations period on a potential client's claims, or the consequences of non-observance.

The Majority opinion plucks from its mooring in Judge Jordan's explication of his "Conclusions of Law," in the portion sub-titled "Lunsford's Hiring of and Representation by [Rand]," analyzing whether Rand violated MLRPC 1.1, 1.3, 1.4, or 8.4(d), his conclusory statement that "it is clear to the court that Lunsford knowingly failed to file a timely grievance on his own behalf and was well aware that he was thereafter precluded from filing one." Op. at 717 n. 12, 57 A.3d at 1002 n. 12.[2] Pivoting on this finding,[3] the Majority opinion maintains that this finding "undercuts the notion that Rand did not explain fully to Mr. Lunsford the consequences of not filing a grievance and the need for a timely response." *Id.*

First, as to the Majority opinion's implicit acceptance of the above finding as unimpeachable and beyond appellate scrutiny

---

**2.** Although the hearing judge included this statement, treated by the Majority opinion as a finding of fact, in his "Conclusions of Law," I agree with the Majority that the statement appears to be, in reality, a factual finding (but one of a wholly conclusionary or deductive nature and fraught with problems of faulty evidentiary provenance), rather than a conclusion of law. The significance of the distinction lies in the appellate standard of review. *Compare* Md. Rule 16–759(b)(1) (conclusions of law by a hearing judge in attorney disciplinary cases are reviewed de novo by the Court of Appeals, regardless of whether a party files exceptions) *with* Md. Rule16–759(b)(2)(A) (if no exceptions are filed to a finding of fact, the Court of Appeals may, but is not required, to treat the finding as established for the purpose of determining sanction).

**3.** I do not accept as established, for purposes of determining the appropriate sanction, *see* Md. Rule 16–759(b)(2), or any other purpose, this finding. Nor am I compelled to confine my review to only findings that were excepted to expressly. *See* Md. Rule 16–759(b)(2)(B) ("The Court *may* confine its review to the findings of fact challenged by the exceptions." This is a permissive standard.).

because it was not the subject of a specific exception by Bar Counsel, I note that Bar Counsel excepted to the hearing judge's parallel and virtually equivalent finding that "Lunsford was a relatively sophisticated client with particular knowledge and experience as a very long-term county employee in grievance matters." Moreover, bearing in mind that the hearing judge co-mingled, under his heading of "Conclusions of Law" various findings of fact that appear to cut across the analytical currents of not less than four discrete sections of the MLRPC, I am persuaded that Bar Counsel's clear exceptions to the hearing judge's conclusions that Rand did not violate MLRPC 1.1 and 1.4 place in play for thoughtful appellate reflection whether the hearing judge's conclusory finding regarding Lunsford's "knowing[ ] fail[ure] to file a timely grievance on his own behalf and was well aware that he was thereafter precluded from filing one" was clearly erroneous or, more pointedly, even if accepted as established, has any material bearing on whether Rand violated MLRPC 1.1 and 1.4 in other regards.

Placed back into its context in the hearing judge's findings of fact and conclusions of law, the statement as to the judge's view of Lunsford's supposed pre-retention knowledge of the County grievance process vis à vis his ability to have prosecuted a grievance *on his own initiative,* one can see that the statement played only a limited role in Judge Jordan's reasoning that Rand did not violate MLRPC 1.1 or 1.4 solely for failure to remediate (or attempt to remediate), after accepting the representation of Lunsford, Lunsford's failure to file a timely grievance on his own. As Judge Jordan explained:

Petitioner [the Commission] asserts that Respondent's [Rand's] continued representation of Lunsford in the Carroll case without (a) attempting to remediate Lunsford's failure to file a timely grievance, or (b) terminating his representation of Lunsford and refunding all fees paid by Lunsford constitutes professional misconduct.

Petitioner has not proven by clear and convincing evidence that Respondent acted improperly in failing to attempt remediation of the non-filing of the grievance. First,

the grievance deadline is an absolute—substantively identical to a statute of limitations. There is no procedure or even discretionary relief available for a late filing. That is, an attempt to "remediate" had no prospect for success. It cannot be an ethical violation to fail to take action that would have been futile. Furthermore, it is clear to the court that Lunsford knowingly failed to file a timely grievance on his own behalf and was well aware that he was thereafter precluded from filing one.

The issue of Respondent's acceptance of attorney's fees and expense contribution from Lunsford present a more difficult question. [Footnote omitted.]

What seems clear to me from this portion of the hearing judge's findings and conclusions is that the portion which the Majority opinion dissects (in its footnote 11) from the body is but a rejection of one of Bar Counsel's assertions of misconduct, i.e., Rand failed to attempt remediation of Lunsford's failure to file a self-initiated grievance. Even clearer to me from Judge Jordan's fuller explication is that there were additional and further grounds advanced from which I conclude that Rand violated MLRPC 1.1 and 1.4. On those other scores, the hearing judge found that

- [Lunsford] was not told [by Rand] that it was then [at the time Lunsford paid Rand the retainer] too late to join the case as a party, that he was precluded from filing a grievance at that point in time, and that the failure of a timely grievance filing prevented an award of back pay.[4]

\* \* \*

- Respondent accepted payment from Lunsford when he knew or should have known that Lunsford could no longer become a party to the case, could not overcome the failure to file a timely grievance and, therefore, could not receive an award of back pay. . . .

---

4. One can read this as being inconsistent internally with the hearing judge's other statement seized upon by the Majority opinion. Op. at 717 n. 12, 57 A.3d at 1001-02 n. 12.

- The problem here is that the record does not show that Lunsford was placed in a position by Rand to make an informed decision on that matter [i.e., whether it was worth engaging Rand by paying the retainer]. Rand should have expressly . . . advised Lunsford of his ineligibility to become a party or to obtain back pay before accepting him as a client. There is no indication from the testimony or any documentary exhibits that Rand did so. [Parenthetical omitted; bullets supplied.]

Although Judge Jordan concluded only that these findings supported a violation of MLRPC 1.4 (Communication), a conclusion with which I concur, I conclude also that these findings support a violation of MLRPC 1.1 (Competent Representation). At the least, to borrow the Majority opinion's use of the verb "undercuts," op. at 714-15, 717 n. 12, 718, 57 A.3d at 1000, 1001-02 n. 12, 1002, the bulk of Judge Jordan's findings and conclusions undercut the Majority's attributed significance to Judge Jordan's somewhat presumptive and insulated view of Lunsford's knowledge of and experience with the County's grievance process.

### MLRPC 1.5(a)

It was an unreasonable fee for Rand to accept $900 from Lunsford and thereafter fail to perform any meaningful services that could benefit Lunsford. Lunsford could not be added to the Lieutenants' grievance and was therefore ineligible to receive any relief as to the "front pay" claim. As to the prospective pay relief granted voluntarily by the County to all affected lieutenants in the County's employ, and even assuming Rand's efforts on behalf of the grievants was instrumental in persuading the County to offer that relief, Lunsford would have received that relief regardless of whether he was a client of Rand. Thus, Respondent performed no legally beneficial actions for Lunsford, violating MLRPC 1.5(a) by accepting a fee for doing nothing for that client. *See Atty. Griev. Comm'n v. Guida*, 391 Md. 33, 891 A.2d 1085 (2006) (facially reasonable initial fee becomes unreasonable when attorney fails to perform meaningful services).

Accordingly, for what I perceive to be violations of MLRPC 1.1, 1.4, and 1.5(a), I would suspend Rand for thirty days. Rand was reprimanded earlier in 2012 by the Commission, in an unrelated matter, for a violation of MLRPC 8.4(d). The misconduct leading to the reprimand arose in Rand's personal bankruptcy filings in which he included unverified and inaccurate information, some of which was in documents offered under penalty of perjury. Of the typical aggravating factors that the Court may consider in settling on an appropriate sanction, *see Atty. Griev. Comm'n v. Mininsohn*, 380 Md. 536, 575, 846 A.2d 353, 376 (2004), the record in the present case presents: (1) a prior disciplinary offense; (2) multiple offenses; (3) a respondent with substantial experience in the practice of law; and (4) a refusal to acknowledge the wrongful nature of the conduct.[5]

---

**5.** As to the latter aggravating factor, I note the following cavalier attitude of Rand towards his client, Lunsford, in response to questions propounded to him at the evidentiary hearing before Judge Jordan:

    Q.  Did you explain to Mr. Lunsford at any time after May 30—on or after May 30, 2006, that he would not be able to recover any retroactive award of back pay?

    A.  I don't think there was—there was no substantive discussions with Mr. Lunsford. I probably didn't know that he dropped off his money. It didn't matter. He got the relief that everybody paid me to get him. *He didn't get retro pay. Too bad. Sorry. Didn't pay for it.*

*    *    *

    Q.  Did you take note that Mr. Lunsford was not included among the grievants?

    A.  *I may have known and not cared or I may not have focused on it. I don't know. I don't have a recollection. There was nothing I could do about it in any case.*

(Emphasis added.)